## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID M. ALESSI, M.D., P.C.; BRUECK, GOLOSOW, KIM & ASSOCIATES, P.L.; NICHOLAS A. FLUGSTAD, M.D., P.S.; KENT V. HASEN, M.D., P A.; THOMAS G. LISZKA, M.D., PLLC; SUSQUEHANNA VALLEY VEIN CENTER, LLC; LEPORT SURGICAL MEDICAL CORP ; SKIN DEEP LASER MED SPA, INC ; ANDREW D. SMITH, M.D., P.C.; CURTIS PERRY, M.D.; GAIL MALLARD-WARREN, M D., INC ; and INFINITY SPA ORLANDO, LLC, | Case No. |
| | **COMPLAINT FOR DAMAGES** |
| | **[REDACTED VERSION]** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| CYNOSURE, LLC, | |
| Defendant. | |

## TABLE OF CONTENTS

Page

I.    NATURE OF THE CASE ................................................................................. 1

II.   PARTIES ......................................................................................................... 2

III.  JURISDICTION AND VENUE ...................................................................... 7

IV.   FACTUAL BACKGROUND........................................................................... 8

      A.    The non-invasive body-contouring market is a lucrative place for
            medical device manufacturers to compete. ................................................. 8

      B.    Cynosure developed SculpSure to compete against other body-
            contouring machines.................................................................................. 10

      C.    Cynosure aggressively markets SculpSure to physicians and
            practitioners as a superior device requiring only one 25-minute,
            pain-free treatment to achieve results. ..................................................... 14

      D.    SculpSure does not work as represented: it is not effective in a single
            treatment (if at all), it is not painless, and it does not allow the
            operator to leave the patient alone in the room during the
            treatment.................................................................................................... 19

      E.    Cynosure's own clinical department has admitted to the company
            deceiving many of its customers using deceptive ██████████ and
            ██████████ messaging in the exact ways that Plaintiffs allege. ............ 23

      F.    Cynosure misrepresented SculpSure's attributes to Plaintiffs, which
            have been damaged because SculpSure is unfit for its intended
            purpose....................................................................................................... 28

            1.    David M. Alessi, M.D., P.C. (The Alessi Institute)....................... 28

            2.    Brueck, Golosow, Kim & Associates, P.L..................................... 29

            3.    Nicholas A. Flugstad, M.D., P.S. (Flugstad Plastic Surgery) ....... 30

            4.    Kent V. Hasen, M.D., P A. ............................................................ 32

            5.    Thomas G. Liszka, M.D., PLLC (Ballantyne Plastic Surgery)..... 35

            6.    Susquehanna Valley Vein Center, LLC (Revive Medical Spa
                  & Laser Treatment Center) ........................................................... 37

        7.      LePort Surgical Medical Corp. (Smart Dimensions Weight
                Loss) ................................................................................ 39

        8.      Skin Deep Laser Med Spa, Inc. .......................................... 41

        9.      Andrew D. Smith, M.D., P.C. ............................................. 42

        10.     Curtis Perry, M.D. (A Sculpted You) .................................. 43

        11.     Gail Mallard-Warren, M.D., Inc. (Bodilogik Med Spa) .............. 45

        12.     Infinity Spa Orlando ......................................................... 46

V.      TOLLING OF STATUTE OF LIMITATIONS ............................... 49

VI.     CLAIMS ALLEGED .............................................................. 50

COUNT I VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
        (CAL. BUS. & PROF. CODE §§ 17200, *et seq.*) ............................. 50

COUNT II COMMON LAW FRAUD (CALIFORNIA) ............................... 52

COUNT III FRAUD IN THE INDUCEMENT (CALIFORNIA) ...................... 53

COUNT IV NEGLIGENT MISREPRESENTATION (CALIFORNIA) ................ 55

COUNT V VIOLATIONS OF THE FLORIDA DECEPTIVE & UNFAIR
        TRADE PRACTICES ACT (FLA. STAT. §§ 501.201, *et seq.*) ............ 56

COUNT VI COMMON LAW FRAUD (FLORIDA) .................................. 57

COUNT VII FRAUD IN THE INDUCEMENT (FLORIDA) ........................ 58

COUNT VIII NEGLIGENT MISREPRESENTATION (FLORIDA) ................... 60

COUNT IX COMMON LAW FRAUD (MASSACHUSETTS) ....................... 61

COUNT X FRAUD IN THE INDUCEMENT (MASSACHUSETTS) ................. 62

COUNT XI NEGLIGENT MISREPRESENTATION (MASSACHUSETTS) .......... 64

COUNT XII VIOLATION OF NORTH CAROLINA UNFAIR TRADE
        PRACTICES ACT (N.C. GEN. STAT. ANN. §§ 75-1.1, *et seq.*) ....... 65

COUNT XIII COMMON LAW FRAUD (NORTH CAROLINA) .................... 66

COUNT XIV FRAUD IN THE INDUCEMENT (NORTH CAROLINA) ............. 67

COUNT XV NEGLIGENT MISREPRESENTATION (NORTH CAROLINA) ......................... 69

COUNT XVI COMMON LAW FRAUD (PENNSYLVANIA)...................................... 70

COUNT XVII FRAUD IN THE INDUCEMENT (PENNSYLVANIA)...................................... 72

COUNT XVIII NEGLIGENT MISREPRESENTATION (PENNSYLVANIA)........................... 73

COUNT XIX VIOLATION OF WASHINGTON CONSUMER PROTECTION
ACT  (WASH. REV. CODE ANN. §§ 19.86.010, *et seq.*) ................................... 74

COUNT XX COMMON LAW FRAUD (WASHINGTON)......................................... 76

COUNT XXI FRAUD IN THE INDUCEMENT (WASHINGTON) ........................................ 78

COUNT XXII NEGLIGENT MISREPRESENTATION (WASHINGTON) ............................... 79

VII.    PRAYERS FOR RELIEF.......................................................................... 81

VIII.    JURY DEMAND.................................................................................... 84

010674-11/1211355 V1

Plaintiffs David M. Alessi, M.D., P.C.; Brueck, Golosow, Kim & Associates, P L.; Nicholas A. Flugstad, M.D., P.S.; Kent V. Hasen, M.D., P A.; Thomas G. Liszka, M.D., PLLC; Susquehanna Valley Vein Center, LLC; LePort Surgical Medical Corp.; Skin Deep Laser Med Spa, Inc ; Andrew D. Smith, M.D., P.C.; Curtis Perry, M.D.; Gail Mallard-Warren, M.D., Inc.; and Infinity Spa Orlando LLC (collectively "Plaintiffs") bring this Complaint against Defendant Cynosure, LLC. Plaintiffs allege the following based upon personal knowledge and experience, and as to all other matters upon information and belief, including investigation conducted by its attorneys:

## I.    NATURE OF THE CASE

1.    In 2015, Cynosure, LLC began selling the SculpSure Non-Invasive Body Contouring Platform ("SculpSure") to physicians, aesthetic surgery practices, and medical spas (or "med spas") across the United States. Cynosure marketed SculpSure as an effective way for medical practices to reduce fat in a patient's midsection through the use of laser technology.

2.    As part of an aggressive campaign to induce Plaintiffs to purchase the almost $200,000 machine, Cynosure materially misrepresented several attributes of the SculpSure device. Cynosure claimed that, *inter alia*: (a) patients required only one 25-minute treatment to achieve the promised, optimal results; (b) SculpSure is virtually painless or "pain-free" and easily tolerated by the patient without pain medication or anesthesia; and (c) the procedure could be performed "hands-free" without a physician or trained staff member needing to be present during the majority of the treatment.

3.    But SculpSure seldom achieves results in patients after *multiple* treatments—much less so with just the single procedure Cynosure claimed would suffice. Nor is SculpSure "pain-free," with patients frequently complaining of severe pain, sometimes to the point of requesting the treatment be stopped altogether. And Cynosure's claims of SculpSure being "hands-free" are

– 1 –

similarly deceptive. The device requires that the operator constantly adjust energy levels based on patient feedback, and the potential for pain necessitates that the operator remain in the room to monitor patient comfort.

4.     Not surprisingly, practices failed to achieve the success that Cynosure promised, and instead have found SculpSure detrimental to their business.

5.     By recommending it, practitioners risk good will, encouraging patients to pay thousands of dollars for a procedure they do not believe in themselves.

6.     Performing the treatment also threatens to drain resources while taxing doctors and staff members. As the unsuccessful treatments add up, offices must futilely work with Cynosure to find a solution, deal with complaints from unsatisfied patients, and perform retreatments or alternative procedures free of charge.

7.     Finally, continuing to own the machine jeopardizes these practices' financial health. The device's failures render it incapable of recouping its significant cost—a number that continues to grow with each refund or free retreatment necessarily offered to keep customers happy.

8.     In short, Cynosure has knowingly misrepresented the very attributes of SculpSure that were supposed to set itself apart from its competitors, harming those Plaintiffs whom it deceived. Plaintiffs would have never purchased a SculpSure had they known the truth. Plaintiffs have been in fact deceived by Cynosure's representations, did not receive the benefit of the bargain, and suffered actual damages.

## II.     PARTIES

9.     David M. Alessi, M.D., P.C. is a California professional corporation that operates as the Alessi Institute at 9735 Wilshire Boulevard, Suite 300, Beverly Hills, California 92037. The

Alessi Institute provides facial plastic surgery and aesthetic treatments, and it bought a SculpSure to supplement its practice in December 2015. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [The Alessi Institute] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." The Alessi Institute was injured in its property and business by the actions of Cynosure, as described herein, and suffered actual damages.

10.     Brueck, Golosow, Kim & Associates, P.L. is a Florida company that operates at 3700 Central Avenue, Suite 1, Ft. Myers, Florida 33901. Brueck, Golosow, Kim & Associates provides plastic surgery, Botox, and other cosmetic medical treatments, and it purchased a SculpSure in January 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Brueck, Golosow, Kim & Associates] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Brueck, Golosow, Kim & Associates was injured in its property and business by the actions of Cynosure, as described herein, and suffered actual damages.

11.     Nicholas A. Flugstad, M.D., P.S. is a Washington professional service corporation operating as Flugstad Plastic Surgery at 2950 Northup Way, Suite 100, Bellevue, Washington 98004. Flugstad Plastic Surgery provides cosmetic surgery, various medical aesthetic treatments, and breast cancer reconstruction. It bought a SculpSure to supplement its practice in February 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth

of Massachusetts. [Flugstad Plastic Surgery] agrees to submit all disputes arising out of, or relating

to, this Agreement to a court in Boston." Flugstad Plastic Surgery was injured in its property and

business by the actions of Cynosure, as described herein, and suffered actual damages.

12.    Kent V. Hasen, M.D., P A. is a Florida professional association operating at 3699

Airport Pulling Road North, Naples, Florida 34105. Dr. Hasen provides a variety of cosmetic

surgery options and medical aesthetic treatments, and he bought a SculpSure in January 2016. His

purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement

shall be governed by and construed under the substantive laws of the Commonwealth of

Massachusetts. [Dr. Hasen] agrees to submit all disputes arising out of, or relating to, this

Agreement to a court in Boston." Dr. Hasen was injured in his property and business by the

actions of Cynosure, as described herein, and suffered actual damages.

13.    Thomas G. Liszka, M.D., PLLC is a North Carolina professional limited liability

company that does business as Ballantyne Plastic Surgery at 14135 Ballantyne Corporate Place,

Charlotte, North Carolina 28277. Ballantyne Plastic Surgery offers a variety of cosmetic

treatments, and it bought a SculpSure to supplement its practice in October 2015. Its purchase

agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be

governed by and construed under the substantive laws of the Commonwealth of Massachusetts.

[Ballantyne Plastic Surgery] agrees to submit all disputes arising out of, or relating to, this

Agreement to a court in Boston." Ballantyne Plastic Surgery was injured in its property and

business by the actions of Cynosure, as described herein, and suffered actual damages.

14.    Susquehanna Valley Vein Center, LLC is a Pennsylvania limited liability company

that does business as Revive Medical Spa & Laser Center at 1140 Sheridan Street, Williamsport,

010674-11/1211355 V1

Pennsylvania 17701. Revive Medical Spa offers medical aesthetic treatments, and it bought a SculpSure in March 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Revive Medical Spa] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Revive Medical Spa was injured in its property and business by the actions of Cynosure, as described herein, and suffered actual damages.

15.     LePort Surgical Medical Corporation is a California corporation that does business as Smart Dimensions Weight Loss at 18111 Brookhurst Street, #5600, Fountain Valley, California 92708. Smart Dimensions provides weight loss services through invasive and non-invasive treatment modalities and it purchased a SculpSure in January 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Smart Dimensions] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Smart Dimensions was injured in its property and business by the actions of Cynosure, as described herein, and suffered actual damages.

16.     Skin Deep Laser Med Spa, Inc. is a California corporation that operates at 425 S Fair Oaks Avenue, Pasadena, California 91105. Skin Deep Laser Med Spa provides cosmetic surgery and other aesthetic procedures and it bought two SculpSure units in August 2015. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Skin Deep Laser Med Spa] agrees to submit all disputes arising out of, or relating

to, this Agreement to a court in Boston." Skin Deep Laser Med Spa was injured in its property and business by the actions of Cynosure, as described herein, and suffered actual damages.

17.     Andrew D. Smith, M.D., P.C. is a California professional corporation that operates at 16100 Sand Canyon Avenue, #230, Irvine, California 92618. Dr. Smith's practice focuses on plastic surgery and he purchased a SculpSure in February 2016. His purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Dr. Smith] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Dr. Smith was injured in his property and business by the actions of Cynosure, as described herein, and suffered actual damages.

18.     Curtis Perry, M.D. is an individual who owns and operates as a sole proprietorship, A Sculpted You, at 121 West Whittier Boulevard, La Habra, California 90631. Dr. Perry's practice provides primarily cosmetic treatments, and he purchased a SculpSure in June 2016. His purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Dr. Perry] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Dr. Perry was injured in his property and business by the actions of Cynosure, as described herein, and suffered actual damages.

19.     Gail Mallard-Warren, M.D., Inc. is a California corporation that operates as Bodilogik Med Spa at 6107 North First Street, #012, Fresno, California 93710. Bodilogik Med Spa provides a variety of aesthetic treatments, and it bought a SculpSure to supplement its practice in October 2015. Its purchase agreement with Cynosure referred to terms and conditions that

stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Bodilogik Med Spa] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston." Bodilogik Med Spa was injured in its property and business by the actions of Cynosure, as described herein, and suffered actual damages.

20.      Infinity Spa Orlando, LLC is a Florida limited liability company that previously operated at 25 West Kaley Street in Orlando, Florida. Infinity Spa Orlando specializes in facial and body contouring procedures and it bought a SculpSure in June 2016. Its purchase agreement with Cynosure referred to terms and conditions that stated: "[the] Agreement shall be governed by and construed under the substantive laws of the Commonwealth of Massachusetts. [Infinity Spa Orlando] agrees to submit all disputes arising out of, or relating to, this Agreement to a court in Boston, Massachusetts." Infinity Spa Orlando was injured in its property and business by the actions of Cynosure, as described herein, and suffered actual damages.

21.      Defendant Cynosure, LLC is a corporation incorporated and existing under the laws of Delaware with its principal place of business located at 5 W Carlisle Road, Westford, Massachusetts 01886. Cynosure has developed and marketed several medical devices and lasers, including SculpSure, which it has sold to medical practitioners internationally.

### III.      JURISDICTION AND VENUE

22.      This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the action lies between citizens of different states.

23.      Venue is proper because the action arises from acts and occurrences within the Commonwealth of Massachusetts; Defendant Cynosure, LLC is headquartered in Westford, Massachusetts; and the parties agreed, via a choice-of-law provision and forum selection clause in

010674-11/1211355 V1

their purchase agreements, to submit all disputes to a court in Boston, Massachusetts, subject to Massachusetts law.

## IV.    FACTUAL BACKGROUND

**A.    The non-invasive body-contouring market is a lucrative place for medical device manufacturers to compete.**

24.    Non-invasive body-contouring procedures constitute a large and rapidly growing sector of the cosmetic surgery market in the United States, with the number of treatments performed having increased by approximately 6% in 2018 compared to the previous year.[1]

25.    These procedures aim to eliminate stubborn fat from certain areas of the body. Body-contouring, however, differs from liposuction. Liposuction uses suction techniques to surgically extract fat deposits from specific areas of the body. Because liposuction requires anesthesia, it is typically an outpatient procedure at a surgery center; or, if large amounts of fat are being removed, the procedure will be done in a hospital and may require an overnight stay. Patients typically return to work after several days and to normal activities within two weeks.[2]

26.    Body-contouring, by contrast, uses non-invasive medical devices (e.g., lasers) to eliminate or shrink fat cells without an incision or anesthesia. Practitioners most commonly employ it to diminish small pockets of stubborn fat and reduce the circumference of a patient's

---

[1] American Society of Plastic Surgeons, "2018 Cosmetic Plastic Surgery Statistics," at 2, available at https://www.plasticsurgery.org/documents/News/Statistics/2018/plastic-surgery-statistics-report-2018.pdf.

[2] *Liposuction*, MAYO CLINIC (Nov. 29, 2016), http://www.mayoclinic.org/tests-procedures/liposuction/home/ovc-20197272; *How to Choose Between Liposuction and Noninvasive Fat Reduction Procedures*, AM. BD. OF COSMETIC SURGERY BLOG (Aug. 19, 2015), http://www.americanboardcosmeticsurgery.org/liposuction/how-to-choose-between-liposuction-and-noninvasive-fat-reduction-procedures/; *Liposuction*, MEDINCENET, http://www.medicinenet.com/liposuction/page3.htm (last visited June 15, 2018).

midsection and flanks. These procedures are commonly performed in a physician's office or med spa without anesthesia and are appealing because they do not require any recovery time.[3]

27.    Over the last decade, many body-contouring devices have appeared on the market, with companies developing different modalities to achieve the fat reduction.[4]

28.    For example, Zerona uses a low-level laser to target superficial fat cells. The laser does not destroy or kill the fat cells, but it disrupts their membranes, causing them to release their contents. The end result is that the affected fat cells shrink, causing a reduction in the belly, waist, or body size of the patient. Patients feel no pain. But because the treatment only targets superficial fat cells, it typically takes about six to twelve 40-minute treatments to achieve results.[5]

29.    Another technology, CoolSculpting, uses a process called cryolipolysis to kill fat cells. Because fat cells freeze at higher temperatures than the surrounding tissue, the CoolSculpting device can deliver cold temperatures through the skin to freeze fat cells without damaging the skin. Targeted fat cells eventually die before the body removes them through its natural processes, yielding a reduction in size in the treated area. However, because the machine works by pulling a patient's skin into the device to apply very cold temperatures, patients frequently experience

---

[3] AM. BD. OF COSMETIC SURGERY BLOG, *supra* note 2; Deborah Kotz, *CoolSculpting and Zerona: Body Sculpting Without Surgery*, US NEWS & WORLD REPORT (Sept. 17, 2010), http://health.usnews.com/health-news/blogs/on-women/2010/09/17/coolsculpting-and-zerona-body-sculpting-without-surgery.

[4] AM. BD. OF COSMETIC SURGERY BLOG, *supra* note 2.

[5] *How Does the Zerona Laser Work?*, MYZERONA.COM, http://www.myzerona.com/what-is-zerona.html (last visited June 15, 2018); R. Stephen Mulholland, Malcolm D. Paul, & Charbel Chalfoun, *Noninvasive Body Contouring with Radiofrequency, Ultrasound, Cryolipolysis, and Low-Level Laser Therapy*, 38 CLINIC IN PLASTIC SURGERY 503, 514–17 (2011), available at http://www.invasix.com/upload/articles/peerrev_clinps_titefxmention.pdf; Kotz, *supra* note 3.

discomfort for the first five to ten minutes of the procedure. The entire procedure takes 35 minutes, but CoolSculpting usually recommends more than one visit to achieve results.[6]

**B.    Cynosure developed SculpSure to compete against other body-contouring machines.**

30.    Cynosure, located in Westford, Massachusetts, is a corporation that specializes in the marketing and sale of medical devices utilizing laser technology for cosmetic and aesthetic use. Specifically in the area of non-invasive body-contouring, Cynosure sells a device it calls "SculpSure."[7]

31.    Cynosure developed and manufactured SculpSure from its Westford offices to compete in the non-invasive body-contouring market against Zerona, CoolSculpting, and similar devices. The machine uses a laser to heat adipose tissue (loose connective tissue in which fat cells accumulate[8]) to a temperature between 42°C and 47°C. Cynosure claimed that this would cause the targeted fat cells to eventually die before being removed by the body's lymphatic system.[9]

32.    The machine has four long, flexible arms that are part of what Cynosure calls the "umbilical management system." At the end of each arm is a rectangular applicator.[10]

---

[6] *How It Works*, COOLSCULPTING, http://www.coolsculpting.com/what-is-coolsculpting/how-it-works/ (last visited June 15, 2018); *What To Expect*, COOLSCULPTING, http://www.coolsculpting.com/what-is-coolsculpting/what-to-expect/ (last visited June 15, 2018); *FAQs*, COOLSCULPTING, http://www.coolsculpting.com/what-is-coolsculpting/faqs/ (last visited June 15, 2018); Kotz, *supra* note 3;

[7] *About Cynosure*, CYNOSURE, http://www.cynosure.com/about-cynosure/ (last visited June 15, 2018); *SculpSure*, CYNOSURE, http://www.cynosure.com/product/sculpsure/ (last visited June 15, 2018).

[8] *Adipose Tissue*, DICTIONARY.COM, http://www.dictionary.com/browse/adipose-tissue.

[9] *SculpSure*, CYNOSURE, http://www.cynosure.com/product/sculpsure/ (last visited June 15, 2018).

[10] SculpSure Operator's Manual (Rev. 4, Apr. 2016), at 12.



33.    During the procedure, the operator arranges several plastic frames onto the

patient's body in the treatment area, applies a lotion to certain areas of the patient's skin within

those frames, and then attaches the rectangular applicators to the frames.[11]



34.    Each applicator used during the procedure consumes one "PAC." PACs are credits

that Cynosure loads onto a PAC Key. Without a sufficiently loaded PAC Key inserted into the

USB port on the SculpSure, the machine will not function. Med spas and physicians must

therefore purchase PAC Keys from Cynosure in advance before treating patients. As of April 2016,

a PAC Key came loaded with 100 PACs and cost $5,000.[12]

---

[11] SculpSure Clinical Reference Guide (Rev. 2), at 24–28.

[12] SculpSure Operator's Manual (Rev. 4, Apr. 2016), at 36; CYNO - Q1 2016 Cynosure Inc.
Earnings Call, at 3 (Apr. 26, 2016).

35.     Once the applicators are in place, the operator initiates the treatment. Each treatment has two phases: "build mode" and "sustain mode." Build mode occurs for the first four minutes of the procedure, during which the machine attempts to "heat[] the fat to the target temperature." Sustain mode lasts the remaining 21 minutes and aims to "maintain[] the target temperature in the fat layer."[13]

36.     The machine can deliver energy in a range of 0.90 to 1.40 Watts per square centimeter (W/cm$^2$), in increments of 0.05 W/cm$^2$. The build mode power density setting defaults to 1.10 W/cm$^2$.



37.     Despite the default setting being set to 1.10 W/cm$^2$, Cynosure advises the operator to start at a low level and increase the energy, adjusting the energy levels up or down based on the patient's feedback regarding what they feel. Initially, Cynosure released the following Zone Adjustment Chart to guide the treatment:[14]

---

[13] SculpSure Clinical Reference Guide (Rev. 2), at 29.
[14] SculpSure Clinical Reference Guide (Rev. 2), at 32.

| Zone Score | ZONE |
|---|---|
| 1 | Pleasant cool/cold feeling.<br>Increase setting. |
| 2 | Gentle warming and cooling.<br>Increase setting. |
| 3 | Tingly, short intervals of warmth and cooling.<br>No change in setting. |
| 4 | Longer peaks of moderate deep warmth and cooling.<br>No change in setting. |
| | Beyond Fat Destruction Zone.<br>Select Advance-to-Cool button. |

(Zones 3 and 4 labeled "Fat Destruction Zone")

38.     When the patient reports "moderate deep warmth and cooling" periods, the operator should maintain that level.[15]

39.     According to Cynosure, at this point, the operator can leave the patient in the room with a "transmitter button to page [the staff]" in the event he or she experiences heat or discomfort beyond "moderate deep warmth and cooling." The operator can then return to provide an "Advance-to-Cool" shot for temporary relief to the patient.[16]

40.     At no time during the marketing of SculpSure did Cynosure report that patients would feel pain, have to endure heat to the point of an intense burning sensation, or require any painkiller or anesthesia.

---

[15] *Id.*

[16] *Id.* at 31–32.

**C.      Cynosure aggressively markets SculpSure to physicians and practitioners as a superior device requiring only one 25-minute, pain-free treatment to achieve results.**

41.      The FDA cleared Cynosure to market its SculpSure device in mid-2015. Cynosure in turn planned to officially launch the product later that year.[17]

42.      By autumn 2015, Cynosure engaged in a motivated campaign to sell SculpSure to various cosmetic surgery providers, med spas, and practitioners across the country. From its Massachusetts headquarters, the company developed a consistent message to distinguish SculpSure from its competitors (namely CoolSculpting). Cynosure created videos (both for the practitioners to which it marketed and for use with the practices' prospective clients), brochures, webpages, presentations, and other promotional materials reflecting that message.[18] Cynosure distributed these materials to potential purchasers through its website, marketing department, and sales representatives.

43.      Specifically, Cynosure emphasized three aspects of the device critical to purchasers.

44.      First, Cynosure represented to potential buyers that patients would achieve "[d]efined success," "[m]aximal performance," or "optimal results" in one, 25-minute treatment. According to Cynosure's website and marketing brochures, just one treatment would eliminate up to 24% body fat in the treated area.[19] Before-and-after photos showed marked results from just "a

---

[17] *FDA Clears Expanded Use for Cynosure Lipolysis Device*, MEDICAL PRODUCT OUTSOURCING (Jul. 7, 2015), http://www.mpo-mag.com/contents/view_breaking-news/2015-07-07/fda-clears-expanded-use-for-cynosure-lipolysis-device/.

[18] *See* Cynosure Investor Event (Presentation) (Sept. 15, 2015).

[19] SculpSure, CYNOSURE.COM, https://www.cynosure.com/product/sculpsure/ (last visited Aug. 17, 2017); SculpSure Product Presentation (Nov. 2015), at 8.

single treatment in one anatomical area." And by purportedly achieving these end results in only

25 minutes, Cynosure had a straightforward way to distinguish its product from CoolSculpting:[20]



45.     In meetings and emails to potential buyers, Cynosure sales representatives routinely

stressed SculpSure's purported effectiveness in one treatment. They emphasized SculpSure being a

"one-time treatment" or "one and done."

46.     This efficiency was particularly attractive to buyers. If the procedure truly took 25

minutes, those who owned a SculpSure could perform more treatments in a day without having to

tax their staff, hire more employees, or perform follow-up with the patient. Furthermore, being

effective in only one treatment would prove an extraordinary selling point—especially compared to

SculpSure's competitors, none of which could claim the same. One treatment meant a minimal

time commitment, lower cost, and lack of follow-up treatments for the patient. This would provide

practices with a crucial marketing tool to sell the procedure to patients.

---

[20] SculpSure Product Presentation (Nov. 2015), at 7, 12–44.

47.     Second, Cynosure stressed that the procedure would be a comfortable and pain-free experience for patients, despite the fact that SculpSure utilized very high temperatures to eliminate the fat cells.

48.     According to Cynosure, SculpSure's "Contact Cooling" system would "assist in maintaining safe and comfortable skin surface temperatures." At the proper setting, Cynosure claimed that SculpSure would cause no more than "long[] peaks of moderate deep warmth and cooling."[21] Cynosure's marketing materials assured that "[m]ost patients feel a tingling sensation intermittently which is well tolerated"[22] and "[c]omfortable."[23]

49.     Cynosure sales representatives again highlighted this purported attribute of SculpSure. Sales representatives claimed that SculpSure was "painless," "virtually painless," "pain-free," "not painful," or resulted in "no pain."

50.     To demonstrate the tolerability of the procedure, Cynosure marketing videos showed a woman casually reading during the procedure without any visible signs of discomfort and without any staff present in the room to monitor her.[24] Consistent with these representations, Cynosure also held live demonstrations at various promotional events where a model would sit and supposedly receive the treatment while talking to audience members to illustrate how painless the procedure was.

51.     If true, SculpSure's painlessness would amount to another attractive attribute to buyers. Patients are naturally less inclined to undergo procedures that will cause them pain or

---

[21] SculpSure Clinical Reference Guide (Rev. 2), at 9, 32.

[22] SculpSure Marketing Brochure (2015), at 2.

[23] SculpSure Product Presentation (Nov. 2015), at 8.

[24] *See, e g., DocWeb, SculpSure – Head to Head Treatment,* YOUTUBE (Jan. 16, 2016) https://www.youtube.com/watch?v=Def18hMKFzI (last visited June 15, 2018).

discomfort. And non-invasive body contouring patients are even less inclined, given they are seeking alternatives to painful liposuction procedures. By being purportedly "painless," SculpSure owners could easily distinguish the treatment from other non-invasive fat reduction treatments. For example, CoolSculpting's suction mechanism and intense cold meant patients would have to endure at least a few minutes of discomfort during the procedure. So SculpSure offered the promise of attracting those patients who may be more hesitant to body contouring.

52.    Third, Cynosure promoted the device as "hands-free,"[25] including a pager system with the device that would allow staff to "leav[e] the treatment room" but still communicate with patients. In its manual, Cynosure noted that a patient could use the transmitter to request "a magazine or water" during the treatment even though the staff member may not be in the room.[26] And in online promotional videos, Cynosure showed patients being left alone in the treatment room after only a few minutes:[27]

---

[25] Cynosure Investor Event (Presentation) (Sept. 15, 2015).

[26] SculpSure Operator's Manual (Rev. 4, Apr. 2016), at 35.

[27] DocWeb, *SculpSure – Head to Head Treatment*, YOUTUBE (Jan. 16, 2016), https://www.youtube.com/watch?v=Def18hMKFzI (last visited June 15, 2018).



53.    Sales representatives also highlighted this feature, referring to SculpSure as "completely hands free," a "set-it-and-forget-it" procedure, or a "walk away" treatment. Sales representatives represented that operators of the device need only hook up the patient to the machine and begin the treatment; after a few minutes, the patient and treatment wouldn't require monitoring. According to sales representatives, this meant staff could leave the room and utilize their time more efficiently, assisting other patients, taking care of paperwork, or even performing a separate procedure, such as a Botox injection. It also meant that the treatment wouldn't be operator dependent, so practices need not rely on the ability of staff members providing the treatment to produce consistent clinical outcomes. Potential purchasers found this potential aspect of the device appealing.

– 18 –

54.    All told, Cynosure's efforts to sell the machine promoting these three attributes were successful.[28] Cynosure sold hundreds of SculpSures since 2015, with approximately 350 in the vicinities of five cities (Boston, Los Angeles, Miami, Chicago, and New York City) alone.[29]

55.    Hologic, Inc , who acquired Cynosure for approximately $1.44 billion in early 2017, consistently singled out SculpSure when discussing the basis for the massive acquisition of the company.[30]

**D.    SculpSure does not work as represented: it is not effective in a single treatment (if at all), it is not painless, and it does not allow the operator to leave the patient alone in the room during the treatment.**

56.    Cynosure's representations about SculpSure proved false. SculpSure is not a one-and-done treatment, is not painless, and is not hands-free.

57.    From the onset, patients failed to achieve results from a SculpSure procedure despite being treated as directed using Cynosure's Zone Adjustment Chart. Only months into the SculpSure launch, Cynosure was forced to revise its treatment protocol for the device. In mid-2016, Cynosure introduced a "Treat to Complete" treatment plan, advising doctors that, to get adequate results with SculpSure, multiple treatments on multiple areas would most likely be

---

[28] *See* CYNO - Q1 2016 Cynosure Inc. Earnings Call, at 3 (Apr. 26, 2016) ("By virtually every measure SculpSure continues to exceed our expectation."); CYNO – Q2 2016 Cynosure Inc. Earnings Call, at 3 (Jul. 26, 2016) ("Revenue for the quarter increased to a record $110.3 million, 32% higher than the year-over-year period. The primary contributors to the top-line results were SculpSure, our exciting new hyperthermic laser treatment for noninvasive fat reduction . . . ."); CYNO – Q3 2016 Cynosure Inc. Earnings Call, at 3 (Oct. 25, 2016) ("I will now update you on SculpSure, which has generated meaningful revenue for the past four full quarters and continues to outperform our expectations."); CYNO – Q4 2016 Cynosure Inc. Earnings Call, at 3 (Feb. 07, 2017) ("SculpSure, one full year into its launch, remains ahead of our expectations. Q4 set the high watermark for SculpSure placements in a single quarter.").

[29] *See Patients*, CYNOSURE, http://patients.cynosure.com/ (searching for SculpSure machines located within 100 miles of the following zip codes: 02201, 90001, 33018, 60611, and 10018).

[30] HOLX – Hologic Inc. to Acquire Cynosure Inc. Conference Call, at 4, 6–7, 9 (2017).

necessary.[31] Yet the "Treat to Complete" protocol directly contradicted Cynosure's marketing of SculpSure as a one-time, 25-minute treatment. And plaintiffs were not informed of "Treat to Complete" until *after* they had already purchased the device under the premise that it was a "one-and-done" treatment.

58.    To compensate for poor results, members of Cynosure's Clinical Department, called Advanced Clinical Partners (*ACPs*), often directed physicians and practitioners to raise the energy levels on the machine, contradicting prior claims that any setting between 0.9 and 1.4 W/cm$^2$ would suffice, and often making the treatment more painful. Some ACPs even suggested that once patients appear to have reached the threshold level they can tolerate, the operator should then "bump" the setting higher without the patient's knowledge.

59.    But even at lower energy levels, many experienced excruciating pain. Frequently, patients would jump off the treatment table, curse in agony, or even demand the operator stop the procedure. These circumstances in no way resembled the patient experience described by the company: "tingling sensation[s]" that are "well-tolerated."[32]

60.    The likelihood for pain with SculpSure also makes it impossible for the operator to leave the treatment room and renders the pager system on the device useless. In practice, the procedure requires practitioners to stay in the room for the entire 25 minutes, negating Cynosure's promise of a "hands-free" or "set it and forget it" treatment. For the duration of the treatment, operators must adjust the device's energy levels, provide "Advance to Cool" shots, or coach patients through the pain.

---

[31] SculpSure Clinical Reference Guide (Rev. 4, Apr. 2016), at 15.
[32] SculpSure Marketing Brochure (2015), at 2.

61.     Nor can practices simply administer anesthesia to make the procedure more bearable. The treatment requires feedback from patients to determine the appropriate energy level. If patients lack the ability to feel any pain or excessive heat in the treated area, then they cannot provide the necessary response to the doctor to adjust the energy levels on the machine. Administering anesthesia would also render the procedure inappropriate for med spas or other medical offices—the very practices for whom SculpSure was designed and to which it was marketed. And anesthesia, or even a strong oral analgesic, would require time before the procedure to administer it, downtime after the treatment to allow the patient to recover, and a doctor to monitor the patient to make sure he or she was fit to leave, any of which would render the promise of a 25-minute procedure false.

62.     Given patients' painful experiences with the treatment, Cynosure had to update its Zone Score Adjustment Chart on multiple occasions. When Cynosure first launched SculpSure in 2015, it claimed that a treatment level correlating with "[t]ingly, short intervals of warmth and cooling" would result in "fat destruction."

| Zone Score | ZONE |
|---|---|
| 1 | Pleasant cool/cold feeling. Increase setting. |
| 2 | Gentle warming and cooling. Increase setting. |
| 3 | Tingly, short intervals of warmth and cooling. No change in setting. |
| 4 | Longer peaks of moderate deep warmth and cooling. No change in setting. |
| | Beyond Fat Destruction Zone. Select Advance-to-Cool button. |

*Rev. 2 (2015)*

63.     By April 2016, Cynosure removed that claim, correlating "fat destruction" to what it described as "[l]onger peaks of moderate deep warmth and cooling."

*Rev. 4 (April 2016)*

64.    A few months later, Cynosure changed the chart *again*. This time, it maintained that to achieve results, the patient must feel "[p]rickling, pinching, pressure, [and] longer peaks of moderate deep heat and cooling"[33]—an artful, yet still erroneous description of the distress many patients experience, and one that contradicts what was advertised by Cynosure: a "comfortable," "gentle, warming sensation" that "fl[ies] right by."[34]

---

[33] *Compare* SculpSure Clinical Reference Guide (Rev. 2), *with* SculpSure Clinical Reference Guide (Rev. 4, Apr. 2016), *and* SculpSure Clinical Reference Guide (Rev. 7, Nov. 2016).

[34] SculpSure, CYNOSURE.COM, https://www.cynosure.com/product/sculpsure/ (last visited Aug. 17, 2017).

| Zone Score | ZONE |
|---|---|
| 1 | Pleasant cool/cold feeling. Increase setting. |
| 2 | Gentle warming and cooling. Increase setting. |
| 3 | Tingly, short intervals of warmth and cooling. Increase setting. |
| Fat Destruction Zone  4 | Prickling, pinching, pressure, longer peaks of moderate deep heat and cooling. No change in setting. |
|  | Beyond Fat Destruction Zone. Select Advance-to-Cool button. |

*Rev. 7 (August 2016)*

65.     Cynosure further refuted its earlier claims regarding patient tolerability with attempts to sell another product: Nitronox. Cynosure recommends practices utilize Nitronox—a nitrous oxide based analgesia system—to manage the "pain and anxiety" associated with SculpSure. But the notion that patients may require nitrous oxide to manage their "pain and anxiety" only proves untrue any claim that SculpSure will be a "painless," "pain-free," or even a "comfortable, well-tolerated" treatment.[35]

**E.      Cynosure's own clinical department has admitted to the company deceiving many of its customers using deceptive ███████ and ███████ messaging in the exact ways that Plaintiffs allege.**

66.     To teach its customers how to operate SculpSure, Cynosure's ACPs visit practices after they purchase the device to conduct trainings. But these ACPs learned during their visits that, frequently, the representations made to the practices during the sales process about SculpSure do not align with the device's actual attributes.

67.     Throughout 2016 and 2017, ACPs routinely reported to their superiors that practices purchased SculpSure believing it was a single-treatment procedure, painless, and hands-

---

[35] Nitronox, CYNOSURE.COM, https://www.cynosure.com/product/nitronox/ (last visited October 10, 2019).

free (such that the operator may leave the patient alone during the treatment). The practices believed this, according to the ACPs, because the Cynosure sales force had falsely positioned the device this way. ████████████████████████████████

████████████████████████████████████████

████████████

68.     For example, on February 3, 2016, ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████ Another ACP, ████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████

69.     In March 2016, another ACP, ████████████████████

████████████████████████████████████████

████████████████████████████████ In a March 11, 2016 email,

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████

████████████████████████

70.     Similarly, in a weekly report from ACP ███████████████ on

June 6, 2016, ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████

71.     Such misrepresentations prompted members of the Marketing, Clinical, and Sales

departments in Cynosure to exchange emails on June 6, 2016, with the subject line ████

██████████████████ In that email chain, ███████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

72.     By September 2016, Cynosure's Clinical Department continued to encounter

customers who had been misled. In preparation for an upcoming meeting with the Vice President

of Sales, ██████████████████████████████████████████

████████████ One team member responded that ████████████████████████

████████████████████████ Another ACP responded that ████████████████

██████████████████████████████████████████████

73.     The deception had become so prevalent that ███████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████ And in a follow-up email, ████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███ Following the meeting, on November 22, 2016, ████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████

74.     █████████████████████████ Cynosure continued to deal with sales

representatives misrepresenting SculpSure's core attributes with potential buyers. In May 2017,

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████

75.     The harm from Cynosure's deception has been significant and widespread. Several

practices have been forced to close, burdened by the debt of the machine, the inability to sell the

treatments because the representations were untrue, and the loss of good will from patients. Many have had their machines repossessed because they could not sell the treatments as Cynosure represented and thus could not make their monthly payments.

76.     Cynosure refuses to take the machines back. And selling the device is essentially impossible, because so many frustrated SculpSure owners have also resorted to trying to sell their devices, flooding the market with sellers without any buyers; third-party laser brokers even refuse to buy them.

77.     Many practices have stopped using SculpSure altogether, despite significant monthly payments. They cannot in good faith recommend it to their patients. And even if their patients wanted it, Cynosure's Treat to Complete protocol renders the treatment financially unviable anyway. As Cynosure's Andrea Morrison explained, ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

78.     Ultimately, the situation has left practices in an impossible position. They have spent hundreds of thousands of dollars on a machine that does not work as Cynosure represented. At the same time, they lack the ability to recoup that cost; practices cannot continue to recommend a cosmetic procedure to their patients knowing that it is likely to involve several painful treatments and unlikely to be effective.

F.    **Cynosure misrepresented SculpSure's attributes to Plaintiffs, which have been damaged because SculpSure is unfit for its intended purpose.**

1.    **David M. Alessi, M.D., P.C. (The Alessi Institute)**

79.    David Alessi, M.D. has owned and operated his facial surgery and medical aesthetics practice, the Alessi Institute, for over 25 years in Beverly Hills, California.

80.    In late October 2015, Cynosure sales representatives, Andrea Schwab and Bradley Hallock, dropped by the Alessi Institute unannounced one afternoon to discuss SculpSure with Dr. Alessi. At that meeting, Schwab and Hallock touted SculpSure to be "as good as liposuction." SculpSure was so effective, they claimed, that patients would only need one, 25-minute treatment to reduce their body fat by 24% in the treated area. Schwab and Hallock also claimed that SculpSure was "painless" for the patient. Schwab and Hallock lastly described SculpSure as "hands-free"—a procedure in which the operator need not be in the room with the patient while the device works. In short, they described SculpSure as the ideal "lunchtime procedure"—a quick, "hands free," one-time treatment that patients receive with no pain or downtime, with results similar to liposuction.

81.    Based on Cynosure's representations, Dr. Alessi agreed to purchase a SculpSure for the Alessi Institute for $75,738.14 in November 2015.

82.    The Alessi Institute learned, however, that treating patients with SculpSure was far different than the descriptions offered by Schwab and Hallock. Of the approximately 30 patients treated at the Alessi Institute, many complained of pain from SculpSure, contrary to the sales descriptions offered before purchase. And as for efficacy, patients reported unsatisfactory fat loss after one treatment—certainly not the liposuction equivalency touted during sales pitches. The Alessi Institute attempted to make SculpSure work for their patients as long as it could, even

providing injections to the treated fat tissue to improve treatment outcomes. But ultimately the device proved worthless. The Alessi Institute has stopped providing the treatment for its patients.

83.     Because of these shortcomings, the Alessi Institute has been forced to provide refunds and free treatments to unsatisfied customers. The machine has also lost the practice money, customers, and its reputation.

84.     The Alessi Institute would have never purchased SculpSure had it not been for Cynosure's misrepresentations. It has suffered actual damages arising out of Cynosure's misrepresentations and its purchase of SculpSure.

**2.     Brueck, Golosow, Kim & Associates, P.L.**

85.     Drs. Robert J. Brueck, Lorraine M. Golosow, and Michael K. Kim have operated Brueck, Golosow, Kim & Associates for over 30 years, offering a variety of cosmetic medical procedures for their clients.

86.     In late 2015, Dr. Brueck contacted Cynosure through a contact form on its website regarding SculpSure. In response to that inquiry, sales representative Dave Levin emailed Dr. Brueck to set up a lunch meeting to discuss details. Levin then scheduled a lunch meeting with Dr. Brueck and Dr. Kim at the offices of Brueck, Golosow, Kim & Associates for November 11, 2015.

87.     At the meeting, Levin made several promises to Drs. Brueck and Kim regarding SculpSure. Levin first represented that SculpSure achieved 20–30% fat loss and required only a single 25-minute treatment to be effective. To demonstrate SculpSure's effectiveness, Levin showed the doctors before-and-after photos depicting patients with significant fat reduction after supposedly only receiving one treatment. Regarding patient experience, Levin claimed that a SculpSure treatment would produce "no pain" for the patient. And, according to Levin, the

treatment was simple to administer because it would not require a medical professional to stay in the room during the treatment to adjust levels, move the applicators, or otherwise remain with the patient.

88.    Based on these representations, Brueck, Golosow, Kim & Associates agreed to purchase a SculpSure for $150,750 in December 2015.

89.    But in practice, the representations made by Levin proved untrue. Patients did not experience a 20–30% fat reduction in a single treatment, as Levin claimed. Rather, patients most often complained of no results at all with SculpSure. Nor did patients find the procedure painless, as represented by Levin.

90.    As a result of SculpSure, Brueck, Golosow, Kim & Associates has lost money and customers. To keep some customers happy, it has been forced to provide free treatments to upset customers. And the device has put the practice under financial strain.

91.    Brueck, Golosow, Kim & Associates would have never purchased SculpSure had it not been for Cynosure's misrepresentations. It has suffered actual damages arising out of Cynosure's misrepresentations and its purchase of SculpSure.

### 3.    Nicholas A. Flugstad, M.D., P.S. (Flugstad Plastic Surgery)

92.    For four years, Dr. Nicholas Flugstad has owned and operated Flugstad Plastic Surgery in Bellevue, Washington. The practice provides cosmetic surgery, breast cancer reconstruction, and other cosmetic treatments.

93.    In late 2015, Cynosure representative Jason Kalso and a colleague of his stopped by Flugstad Plastic Surgery to promote SculpSure. During the visit, Kalso arranged to meet Dr. Flugstad at a later time. Dr. Flugstad eventually met with Kalso over two lunch meetings at his practice between late-2015 and early-2016.

– 30 –

94.     During these meetings, Kalso described SculpSure as an FDA-approved device proven to reduce body fat by 24% in the area treated in just one 25-minute treatment. Kalso used a slide show and before-and-after photos to demonstrate SculpSure's effectiveness. The photos demonstrated a dramatic visible change supposedly achieved after just one SculpSure treatment.

95.     Kalso also claimed that SculpSure was "virtually painless," with patients experiencing nothing more than a slight "warming sensation." He further described the treatment as "hands free," which meant that the operator of the device could leave the patient alone in the room while the machine performed the treatment.

96.     Based on these representations, Flugstad Plastic Surgery agreed to purchase a SculpSure for $180,000 on February 18, 2016.

97.     After purchasing the device, however, it became evident that SculpSure would not work as Kalso promised. Patients failed to achieve discernable results after one treatment, and the patients often experienced pain, rendering Kalso's description of the treatment as "virtually painless" false. Some patients even asked to stop their SculpSure treatment due to pain.

98.     Indeed, by approximately April 2016, Cynosure sent representatives to Flugstad Plastic Surgery to retrain the practice on a new protocol, Treat to Complete. The representatives told Dr. Flugstad that instead of one treatment, patients should purchase packages of two-to-three treatments, which would be required for each body area to see results. The representatives openly admitted that based on their findings, one treatment with SculpSure does not produce any results.

99.     In response, Dr. Flugstad asked if Cynosure would also be decreasing the consumable costs since he purchased the device based on the company's representation of SculpSure as a one-time treatment and by increasing the number of treatments, the cost to the

– 31 –

practice to treat a patient increased. Cynosure refused. Dr. Flugstad asked if Cynosure would be

willing to provide treatments to all of its patients he had promised results after one treatment.

Cynosure again refused this request. Finally, Dr. Flugstad requested to return the device, which

Cynosure also denied.

100.    Cynosure never provided advice or support to fix the ongoing issues with poor

treatment outcomes or patient tolerability. And because of these issues with the device,

Dr. Flugstad has had to issue refunds and provide free treatments to appease SculpSure patients.

Many patients refused to return for a second treatment. And the practice's reputation has suffered.

101.    Flugstad Plastic Surgery would have never purchased SculpSure had it not been for

Cynosure's misrepresentations. It has suffered actual damages arising out of Cynosure's

misrepresentations and its purchase of SculpSure.

**4.    Kent V. Hasen, M.D., P.A.**

102.    Dr. Kent V. Hasen has owned and operated his plastic surgery practice for 17 years.

His practice provides a number of cosmetic medical treatments, both surgical and non-surgical.

103.    In late April 2015, Dr. Hasen attended the American Society for Laser Medicine &

Surgery annual conference at the Gaylord Palms Resort & Convention Center in Kissimmee,

Florida. At the conference, Dr. Hasen first learned about SculpSure, from research presented at

the meeting by Cynosure. According to Cynosure, clinical studies with the device demonstrated

significant fat reduction with SculpSure. However, Cynosure was not actively marketing the device

at the time.

104.    Then, on August 26, 2015, Dr. Hasen received an email from Brandon Roberts of

Cynosure, who had previously sold two other Cynosure machines to Dr. Hasen. Roberts stated

that he was "reach[ing] out about a 'pre-market' opportunity" with SculpSure because Dr. Hasen

had previously been "on the ground floor with CoolSculpting." Roberts claimed that Cynosure had "taken over 10 years of research and innovation to carefully bring [SculpSure] to market." He boasted that SculpSure would take over CoolSculpting, because it "has a consumable that's HALF the price, and treatment time of only 20min!!!!" But according to Roberts, "if all of that wasn't incredible enough, one last thing sets it head and shoulders above the competition.... 20–40% reduction in the fat pad from 1 TREATMENT!"

105.    Dr. Hasen agreed to meet Roberts on November 2, 2015, for a follow-up meeting to discuss SculpSure. Brandie Gostigian, PA-C—who ran the nonsurgical fat reduction part of the practice—attended as well. At the meeting, Roberts reiterated that SculpSure would achieve optimal results in just one treatment. Roberts also described the patient experience, claiming it to be "painless." The treatment, Roberts said, would also not require any patient monitoring; Roberts described it as hands-free, allowing the operator to leave the patient alone in the room while the machine worked. According to Roberts, in this sense the machine worked in a similar fashion to CoolSculpting, with which Dr. Hasen and Gostigian were very familiar.

106.    Based on these representations, Dr. Hasen agreed to purchase a SculpSure for $167,742.75 on November 6, 2015.

107.    Dr. Hasen's staff received training on the device in early February 2016. But following training, problems implementing the procedure called into question the veracity of Roberts's pre-purchase statements. Those initially treated with SculpSure found it painful. Furthermore, the Cynosure trainer, Mary Bots, claimed that patients would need monitoring during treatments—either to help patients deal with the pain, adjust treatment levels, or avoid the machine turning off due to treatment errors.

108.    As the weeks and months went by, those patients treated initially had not shown even modest improvements from their SculpSure treatments, contradicting Roberts's promise that patients would see a "20–40% reduction in the fat pad from 1 TREATMENT!" On April 26, 2016, Bots reached out to Gostigian and asked to schedule a follow-up training with SculpSure. This second training took place on May 5, 2016. During the training, Bots revealed for the first time that Cynosure recommends a second treatment six weeks later for patients to see adequate results, thus requiring more treatments than it claimed before the practice purchased the device. Bots also reviewed photos of the practice's initial patients and agreed that there was no improvement with the first and only treatment. She also contradicted Roberts's description, admitting that the operator needs to be present during the treatment to adjust the energy during the build and sustain phases.

109.    One month later, on June 6, 2016, Mary Bots followed up in an email. She explained that patients shouldn't expect "wow" results from one treatment—like Roberts had previously attested. Instead, patients should treat multiple areas "two or more" times. Furthermore, Bots explained that the operator should be treating patients at higher, more painful settings than the company previously recommended. According to Bots, "[p]reviously [Cynosure] believed that zone 3 was sufficient. However results were not consistent when we 'pushed' the patient to zone 3. Moving forward please use zone 4 as your new goal, and titrate the settings as necessary to achieve this new ideal zone 4."

110.    These issues with the device ultimately led Dr. Hasen's practice to stop recommending SculpSure for patients. Most patients complained about the procedure and refused to even return for a follow-up treatment. His staff had to offer free treatments to unsatisfied

customers. The practice lost patients, money, and its reputation. In short, SculpSure possessed none of the traits that Cynosure led Dr. Hasen to believe it had.

111.    Dr. Hasen would have never purchased SculpSure had it not been for Cynosure's misrepresentations. His practice has suffered actual damages arising out of Cynosure's misrepresentations and its purchase of SculpSure.

### 5.    Thomas G. Liszka, M.D., PLLC (Ballantyne Plastic Surgery)

112.    Thomas G. Liszka, M.D. has owned and operated Ballantyne Plastic Surgery for approximately 12 years. Ballantyne Plastic Surgery provides its patients with a number of cosmetic treatments and surgery procedures.

113.    During the summer of 2015, Dr. Liszka received multiple visits from Trent Earhardt, a Cynosure sales representative. During lunch meetings on both July 6 and August 5, Dr. Liszka and Earhardt met for lunch at Ballantyne Plastic Surgery, during which Earhardt introduced Dr. Liszka to SculpSure. Earhardt explained that Cynosure would be launching SculpSure to compete with other non-invasive body contouring devices such as CoolSculpting. Earhardt assured Dr. Liszka that SculpSure would improve on CoolSculpting, particularly in the area of efficacy. According to Earhardt, SculpSure would require only one treatment to achieve optimal results.

114.    After Earhardt left Cynosure in approximately September 2015, Brandon Nye, another Cynosure sales representative, asked to meet with Dr. Liszka about SculpSure to discuss him becoming the first to own SculpSure in the Carolinas. According to Nye, Liszka's practice could even become a SculpSure training center, whereby Cynosure would compensate him to train future SculpSure purchasers to use the device.

115.    Dr. Liszka agreed to meet with Nye and the two met at Ballantyne Plastic Surgery in late October 2015. At that meeting, Nye described SculpSure as a "one-time treatment" with patients seeing optimal results—a 24% body fat reduction—after 12 weeks. Nye showed Dr. Liszka before-and-after photos demonstrating significant fat loss after just one SculpSure treatment to illustrate what to expect from a treatment. During the meeting, Nye also promoted SculpSure's tolerability, describing it as not painful, like CoolSculpting, and as a "comfortable" treatment that only produces a gentle "warming sensation." Nye lastly labelled the procedure as "hands free," meaning the operator could leave the room while the device performed the treatment.

116.    Based on these representations, Ballantyne Plastic Surgery agreed to purchase a SculpSure for $167,750 on November 5, 2015.

117.    Over time, Nye's representations proved false and misleading. Patients frequently complained of the treatment hurting them and of the poor results the SculpSure treatments provided. Cynosure itself would contradict Nye's representation that patients would see "optimal" results after just one treatment, when the company introduced the "Treat to Complete" protocol and told Dr. Liszka he would need to treat patients several times.

118.    Any complaints by Dr. Liszka to Cynosure went unresolved. The company's response was typically to blame the practice; Cynosure claimed that Ballantyne Plastic Surgery was not performing the treatment correctly or treating patients enough times. But many patients refused to even return for a second treatment due to poor results from the first.

119.    SculpSure has caused Ballantyne Plastic Surgery to lose money, lose patients, and lose goodwill. The practice has both refunded and treated for free unhappy customers. The

– 36 –

financial burden SculpSure continues to impose on the practice prevents the business from growing and places the practice under financial distress.

120.    Ballantyne Plastic Surgery would have never purchased SculpSure had it not been for Cynosure's misrepresentations. It has suffered actual damages arising out of Cynosure's misrepresentations and its purchase of SculpSure.

### 6.    Susquehanna Valley Vein Center, LLC (Revive Medical Spa & Laser Treatment Center)

121.    Dr. Suzan McGary owns and operates Revive Medical Spa & Laser Center in Williamsport, Pennsylvania. Revive Medical Spa focuses on medical aesthetic and laser treatments.

122.    In early 2016, Dr. McGary had been researching devices with which to start her medical spa and reached out to Cynosure to inquire about non-invasive body contouring devices. Eventually, Dr. McGary agreed to meet with Cynosure representatives, and on March 3, 2016, she met with Bob Iero and Austin Monroe. At that meeting, Iero and Monroe promoted two Cynosure devices, SmartLipo and SculpSure.

123.    With respect to SculpSure, the representatives claimed SculpSure was a one-and-done treatment, such that patients would only need one session to obtain optimal results. They also described SculpSure as pain-free. They further described the procedure as "completely hands-free" such that the operator could leave the room during the treatment. Iero and Monroe also took Dr. McGary to a practice in Allentown, Pennsylvania, for a demo of the device.

124.    Bob Iero reiterated these selling points again, in a follow-up email on March 4, 2016. In that email, Iero said that SculpSure "[d]elivers results after only ONE treatment." He claimed that it resulted in "[m]inimal discomfort during and after the procedure." And he wrote that it was a "[s]imple, flexible, hands-free application that is NOT operator dependent." Iero also

linked to a Cynosure video comparing SculpSure to CoolSculpting, which showed a patient receiving a SculpSure treatment. In that video, the SculpSure operator leaves the patient alone in the room. The patient then easily tolerates the procedure without any discomfort at all, merely using her phone during the duration of the treatment.

125.    Based on these representations, Revive Medical Spa agreed to purchase a SculpSure for $167,750 on March 25, 2016.

126.    However, little of what Iero claimed about SculpSure wound up being true. Crucially, one treatment was not enough to "deliver results." Even by Cynosure's admission—when it later introduced Treat to Complete—more treatments would be required. But patients did not want to return for multiple treatments when the first failed to show any effect initially. Moreover, patients hated the treatment experience and commonly complained of the pain, contradicting Iero's descriptions regarding patient tolerability. And finally, SculpSure was not hands-free and was indeed "operator dependent"; the operator must stay in the room to adjust treatment levels and manage patient comfort.

127.    Revive Medical Spa naturally complained to Cynosure and sought its guidance to address these issues with the device. But Cynosure offered no solution to the problems with the machine; Cynosure merely recommended to market the ineffective procedure more to increase sales.

128.    Revive Medical Spa has been harmed on account of Cynosure's fraudulent representations. Not only did it purchase a device that it does not want on false pretenses, that device has cause it to lose money, customers, and its reputation.

129.    Revive Medical Spa would have never purchased SculpSure had it not been for Cynosure's misrepresentations. It has suffered actual damages arising out of Cynosure's misrepresentations and its purchase of SculpSure.

**7.    LePort Surgical Medical Corp. (Smart Dimensions Weight Loss)**

130.    Dr. Peter LePort and Dr. Michael A. Russo own and operate Smart Dimensions in Fountain Valley, California. Their practice provides weight loss programs and features a number of invasive and non-invasive treatment options.

131.    In late-2015, Bradley Hallock of Cynosure invited Dr. Russo to attend a Cynosure Aesthetics Masters Course at The London West Hollywood in West Hollywood, California, which took place over the weekend of December 4, 2015. Dr. Russo agreed to attend. At the Aesthetics Masters Course, Dr. Russo first learned about SculpSure from the primary speaker, Dr. R. Stephen Mulholland, who described SculpSure as a "game-changing" technology that achieved a 24% fat reduction in one treatment.

132.    Dr. Russo also met with Cynosure sales representatives, Kris Huston and Bradley Hallock, after Dr. Mulholland's presentation. Huston and Hallock expounded on Dr. Mulholland's presentation. They claimed that only one SculpSure treatment would be required to see optimal results. Huston and Hallock also touted the procedure's tolerability, calling it "virtually painless" with minimal, if any, discomfort. Finally, the sales representatives promoted its functionality, describing SculpSure as a "hands-free" procedure that allowed the operator to leave the room for the duration of the treatment after setting up the patient.

133.    After the Aesthetics Masters Course, Dr. Russo met again with Hallock and Huston on two separate occasions in December 2015 at Smart Dimensions Weight Loss. The two

representatives repeated their earlier claims regarding SculpSure's efficacy, tolerability, and ease-of-use.

134.     Based on these representations, Smart Dimensions Weight Loss agreed to purchase a SculpSure for $165,000 on January 28, 2016.

135.     Initially, Smart Dimensions Weight Loss was very excited to begin using SculpSure. But that excitement quickly faded. The practice immediately received a large amount of negative feedback about the treatment experience due to excessive pain. Dr. Russo had a treatment himself and felt severe pain while being treated. This forced the practice to keep a licensed physician's assistant or doctor in the room to try and soothe the patients during the procedure.

136.     Pain was not the only issue. Results from the treatment were poor. The vast majority of patients did not see any change in fat reduction. Many requested their money back. Others were given free additional SculpSure treatments to no avail.

137.     The practice expressed concern to Cynosure. But Cynosure merely instructed Smart Dimensions to give patients more SculpSure treatments. When Smart Dimensions responded that this would make SculpSure significantly more expensive for patients, Cynosure advised Smart Dimensions that it would have cut the price of the treatment in half to make it more palatable to patients—even if this meant significantly impacting the margins on the procedure.

138.     Eventually, Smart Dimensions believed that it could no longer offer the procedure to patients. SculpSure resulted in such low patient satisfaction, involved significant pain, and required so many expensive treatments without any promise of a positive result. The machine continues to be a financial burden for the practice.

139.    Smart Dimensions would have never purchased SculpSure had it not been for Cynosure's misrepresentations. It has suffered actual damages arising out of Cynosure's misrepresentations and its purchase of SculpSure.

**8.    Skin Deep Laser Med Spa, Inc.**

140.    Dr. Michael Schwartz owns and operates Skin Deep Laser Med Spa in Pasadena, California. Skin Deep Laser Med Spa provides a number of cosmetic medical treatments, including both surgical and nonsurgical options.

141.    Beginning in 2013, Dr. Schwartz worked as a trainer for Cynosure's SmartLipo device, meaning Cynosure would send recent purchasers to Skin Deep for one-to-three days of training on the device. Because of his role as a trainer for SmartLipo, Dr. Schwartz remained in frequent contact with Kris Huston, a sales representative for Cynosure, both over the phone and in person. During these conversations throughout 2015, Huston updated Dr. Schwartz about another product, SculpSure. Huston claimed that Cynosure had developed SculpSure to be a far superior treatment than the existing competitor, CoolSculpting. During a meeting at Dr. Schwartz's office in mid-2015, Huston expounded on why SculpSure's attributes set it apart.

142.    According to Huston, SculpSure was a "one-time" treatment, achieving 24% fat reduction in a single 25-minute procedure. Huston also described SculpSure as "virtually painless" and "not painful," generating nothing more than a slight warming sensation that's easily tolerated. Huston further called SculpSure completely "hands-free"—meaning the operator need not remain in the room with the patient during the procedure.

143.    Based on these representations, Skin Deep Laser Med Spa agreed to purchase two SculpSure units for $301,500 on August 31, 2015.

– 41 –

144.     It became evident, however, that Huston's representations were false. Dr. Schwartz himself had a treatment done after purchasing the device, which he found extremely painful. He also did not see any noticeable change from the procedure.

145.     His patients encountered the same experience. Many could not tolerate the treatment due to pain, either aborting the treatment midway through the 25-minute session or refusing to return for additional treatments. In many cases, Skin Deep had to refund money or comp treatments with Ultrashape, an ultrasound-based fat reduction treatment that the practice was able to achieve results with.

146.     Dr. Schwartz complained to Cynosure, speaking with Susan Waters of the company. Waters denied that Cynosure misrepresented the efficacy of the device, but did not offer a solution to Skin Deep Laser Med Spa's problems with SculpSure.

147.     Because of the issues with SculpSure, Skin Deep Laser Med Spa ceased performing the procedure on patients. Dr. Schwartz attempted to sell his SculpSure machines but could not; too many dissatisfied SculpSure owners attempted to sell theirs as well, flooding the market with sellers and no buyers. The practice continues to suffer financially from the device.

148.     Skin Deep Laser Med Spa would have never purchased SculpSure had it not been for Cynosure's misrepresentations. It has suffered actual damages arising out of Cynosure's misrepresentations and its purchase of SculpSure.

**9.      Andrew D. Smith, M.D., P.C.**

149.     Andrew D. Smith, M.D. has operated his own medical practice in Irvine, California, since 2003. The practice primarily offers cosmetic surgery options to its patients.

150.     In February 2016, Kris Huston visited Dr. Smith at his office and requested a meeting to discuss SculpSure. Dr. Smith agreed, and during their conversation Huston described

SculpSure as a "one-time" treatment, meaning only one SculpSure procedure would be needed to achieve a 24% fat reduction. He also promised that SculpSure treatments generated "no pain" and were easy to administer. According to Huston, the operator could set the patient up and leave them in the treatment room.

151.    Based on these representations, Dr. Smith agreed to purchase a SculpSure for $178,950 in February 2016.

152.    But Cynosure's promises never materialized. Dr. Smith's patients found the treatment painful and could not see any results. They routinely expressed dissatisfaction with SculpSure, leaving Dr. Smith in a difficult spot.

153.    Dr. Smith eventually met with Huston again to discuss his problems with SculpSure, but no solution was offered. Cynosure would not accept the machine back and did not have any solution but to simply try and treat patients several times to get better results.

154.    SculpSure has harmed Dr. Smith's practice. The poor patient experience has led to complaints, lost customers, and loss of reputation. He has been forced to provide free treatments to unsatisfied customers. The device continues to put the practice under financial strain.

155.    Dr. Smith would have never purchased SculpSure had it not been for Cynosure's misrepresentations. He has suffered actual damages arising out of Cynosure's misrepresentations and his purchase of SculpSure.

**10.    Curtis Perry, M.D. (A Sculpted You)**

156.    Dr. Curtis Perry owns and operates the sole proprietorship, A Sculpted You, a cosmetic medical practice, in Whittier, California.

157.    Beginning on February 2, 2016, Kris Huston, a Cynosure sales representative, began emailing Dr. Perry in an attempt to sell SculpSure. These emails eventually led to a series of

office visits by Huston, between March 2016 and May 2016, to discuss SculpSure with Dr. Perry.

Huston also invited Dr. Perry to attend the 2016 Multispecialty Aesthetic Boot Camp at the

Beverly Hills Hotel from June 10, 2016, to June 12, 2016, which Dr. Perry agreed to attend.

Huston also came by A Sculpted You to meet Dr. Perry on the afternoon of June 11, 2016,

following the event, and the morning of June 12, 2016, before the event.

158.    During each of these meetings, Huston promoted SculpSure heavily, attempting to

get Dr. Perry to purchase the device. Huston described SculpSure as the ideal "lunchtime

procedure." Regarding efficacy, Huston deemed SculpSure "one-and-done," in that one treatment

was all that patients needed because SculpSure reduced body fat in the treated area by 24% in a

25-minute session. Huston also aggressively promoted how "comfortable" and easily tolerated the

treatment was. Huston further described the treatment as one that allowed the operator to leave

the room after setting the patient up. The marketing materials, demonstrations, and videos played

at Cynosure's Medical Aesthetics Boot Camp reiterated Huston's promises.

159.    Based on these representations, Dr. Perry agreed to purchase a SculpSure for

$189,000 on June 12, 2016.

160.    Dr. Perry proceeded to market the treatment heavily. He changed A Sculpted You's

website, installed a SculpSure promotional video in his waiting room to run continuously, and

began holding SculpSure events. But this initial excitement with SculpSure faded, as Huston's

representations ended up being false.

161.    The procedure proved very painful—a far cry from the comfortable treatment

described by Cynosure. And as patients reported back regarding their results from treatments, it

was evident the device did not work as advertised either. All but one patient openly complained to Dr. Perry about the treatment. Dr. Perry has had to offer free treatments to dissatisfied customers.

162.    Dr. Perry reached out to Cynosure for help. But the company merely recommended more treatments (despite the fact that initial treatments were unsuccessful) and finding ways to distract patients from the pain.

163.    Unable to lie to his patients about what to expect with SculpSure, Dr. Perry found it difficult to recoup the expensive monthly payments from SculpSure; he could not recommend and treat patients with a treatment his practice does not believe in. The device remains a financial burden. He has lost patients. He has lost his good reputation. And he has lost business opportunities due to SculpSure draining capital from the practice.

164.    Dr. Perry would have never purchased SculpSure had it not been for Cynosure's misrepresentations. He has suffered actual damages arising out of Cynosure's misrepresentations and his purchase of SculpSure.

**11.    Gail Mallard-Warren, M.D., Inc. (Bodilogik Med Spa)**

165.    Dr. Gail Mallard-Warren has owned and operated Bodilogik Med Spa for nine years. Bodilogik provides skin care, injections, and other medical aesthetic treatments for its patients.

166.    In October 2015, Bodilogik Med Spa received an unannounced visit from Jennifer Babington, a Cynosure representative. Babington met with Dr. Mallard-Warren and Joe Warren and described SculpSure as a "breakthrough," because unlike its competitors, patients needed just one treatment to see an optimal result. SculpSure, Babington claimed, would achieve what diet and exercise could not and would permanently destroy 24% of the treated fat cells in 25 painless

minutes. Babington also called the device hands-free, which would allow the operator to leave the room and perform another task while the machine worked.

167.    Based on these representations, Bodilogik Med Spa agreed to purchase a SculpSure for $165,750 on October 14, 2015.

168.    But in reality, SculpSure lacked the core attributes Babington touted to sell it. One treatment didn't suffice. Nor was it pain-free. And the operator needed to remain with the patient throughout the treatment to adjust levels and coach the patients through the procedure. Consequently, virtually all of Bodilogik's SculpSure patients expressed dissatisfaction with their results and the treatment experience. The practice needed to offer free services to SculpSure customers to keep them happy.

169.    Dr. Mallard-Warren complained to Cynosure to no avail. Cynosure merely sent an ACP to conduct additional training, which proved useless.

170.    With SculpSure's expensive monthly payments, Bodilogik came under considerable financial strain. Eventually, the financing company would repossess the device.

171.    Bodilogik Med Spa would have never purchased SculpSure had it not been for Cynosure's misrepresentations. It has suffered actual damages arising out of Cynosure's misrepresentations and its purchase of SculpSure.

**12.    Infinity Spa Orlando**

172.    Lisa Christensen, M.D., Sharon Gallardy, A.R N.P., and Diane Orlando, A.R.N.P. previously owned and operated Infinity Spa Orlando, a boutique med spa located in Orlando, Florida.

173.    In December 2015, Ms. Gallardy and Ms. Orlando attended a conference at the Loews Portofino Bay Hotel in Orlando, Florida, held by Cynosure. There, doctors and

– 46 –

representatives from Cynosure presented its new device, SculpSure. Using PowerPoint

presentations and promotional videos, speakers described the science and technology and praised

certain aspects of the treatment and experience. In particular, the presenters highlighted

SculpSure's: (1) results—patients saw a 20–24% decrease in fat and only took one treatment to be

effective; (2) treatment experience—the treatment lasted just 25 minutes and the operator could

leave the room; and (3) tolerability—patients reported little to no pain. Videos played for the

audience showing patients smiling during the procedure and experiencing no discomfort while the

operator left the room. And Cynosure even gave a purportedly live demonstration of the

treatment, where a Cynosure employee appeared to receive the treatment without showing any

signs of distress.

      174.    Cynosure's presentations at the conference impressed Gallardy and Orlando, who

then discussed purchasing the device with Christensen. In early 2016, the three contacted

Cynosure.

      175.    Cynosure sent them emails, repeating the claims above, and included links to

marketing materials, videos, and presentations that similarly promoted the results, treatment

experience, and tolerability of the procedure. Consistent with those materials, Cynosure's sales

representative, Scott Hidalgo, aggressively hyped the machine in writing, reiterating the same

points. The representative stated that "in 25 min with no discomfort . . . Sculpsure will destroy

25% of a person's fat." He further noted that the operator could leave during the procedure,

telling Infinity Spa to "KEEP IN MIND THE PROCEDURE IS UNATTENDED SO ONCE

YOU HOOK THEM UP AND START THE LASER YOU CAN DO OTHER THINGS." The

"bottom line," according to the representative, was that SculpSure took only "25 minutes," "melt[ed] 25% of a patient[']s fat during 1 treatment," and would be "painless."

176.    Based on these representations, Infinity Spa Orlando agreed to purchase a SculpSure for $165,123.75 in June 2016.

177.    But within months of implementing the device in the practice, Infinity Spa Orlando realized that Cynosure had misrepresented the core features of SculpSure. For example, shortly after purchasing SculpSure, Infinity Spa Orlando had a training session with Lindsay Webber from Cynosure. And as part of training, Webber treated Christensen, Gallardy, and Orlando. But Ms. Orlando found the treatment extremely painful, describing it as similar to experiencing labor contractions. Gallardy also found the experience uncomfortable, and not at all in tune with the descriptions provided by Cynosure up until that point. Not one of them achieved results in the weeks following the procedures. Infinity Spa also treated a number of patients over the summer and fall, none of whom fared better. The treatment caused pain and patients reported a lack of results.

178.    Infinity Spa in turn reported its dissatisfaction to Cynosure. So in November 2016, Cynosure contacted Infinity Spa to "check up" on the practice and arrange a second training, this time with Mary Bots. But the second training proved no more encouraging.

179.    At the second training, Bots oversaw Dr. Christensen treat Gallardy, who found the procedure so painful that she experienced presyncope—a state of lightheadedness, nausea, and blurred vision that precedes fainting, but without losing consciousness. The pain even carried over into the following days, when the treated area became red, swollen, and inflamed.

– 48 –

180.    About a month later, in December 2016, Infinity Spa asked to meet with Cynosure representatives before a conference being held in Orlando. While seemingly reluctant, Cynosure eventually acquiesced, and the parties met for approximately an hour before the conference to discuss Infinity Spa's lack of results. Cynosure proposed that Infinity Spa offer to retreat its patients twice more for a total of three treatments, claiming for the first time that multiple treatments may be needed to see results. Cynosure said that it would reimburse Infinity Spa for the money spent on PACs for these retreatments. Infinity Spa agreed and retreated all of its prior patients for a second and third time. None achieved results.

181.    SculpSure left Infinity Spa in a predicament. The machine cost the business a significant amount of money. But given their own dreadful experiences with the procedure and their clients' universal dissatisfaction, the staff has found it impossible to recommend SculpSure in good faith. The business thus lacks the ability to recoup the expense, to say nothing of the time and good will lost trying in vain to make it work.

182.    In March 2017, Infinity Spa asked Cynosure to take back the laser for a refund. Cynosure refused. Lacking any other viable option, Infinity Spa informed Ascentium Capital that it could repossess the device. Financially, Infinity Spa Orlando would never recover, and has since been forced to close.

183.    Infinity Spa Orlando would have never purchased SculpSure had it not been for Cynosure's misrepresentations. It has suffered actual damages arising out of Cynosure's misrepresentations and its purchase of SculpSure.

### V.    TOLLING OF STATUTE OF LIMITATIONS

184.    Pursuant to *American Pipe & Constr. Co. v. Utah*, 414 U.S. 438 (1974), all claims of the Plaintiffs were tolled during the period from June 16, 2017 (the date *Vita 4 Life, Inc. v.*

*Cynosure, Inc.*, No. 17-cv-11435-DJC (D. Mass) was filed) through August 7, 2019 (the date the

Court denied class certification in *Plastic Surgery Associates, S.C., et al. v. Cynosure, Inc.*, No. 17-cv-

11850-DJC (D. Mass.)).

## VI.    CLAIMS ALLEGED

### COUNT I
### VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE §§ 17200*, et seq.*)

185.    Plaintiffs David M. Alessi, M.D., P.C.; LePort Surgical Medical Corp ; Skin Deep

Laser Med Spa, Inc.; Andrew D. Smith, M.D., P.C ; Curtis Perry, M.D.; and Gail Mallard-Warren,

M.D., Inc. (*California Plaintiffs*) reallege and incorporate by reference all of the preceding

allegations.

186.    The California Plaintiffs bring Count I under the California Unfair Competition

Law (*UCL*), Cal. Bus. & Prof. Code §§ 17200, *et seq.*

187.    Section 17200 of the UCL prohibits unfair competition, which "shall mean and

include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or

misleading advertising." Cal. Bus. & Prof. Code § 17200.

188.    Both the California Plaintiffs and Cynosure are persons under the UCL, and the

California Plaintiffs have standing to sue as persons whom "have suffered injury in fact and [have]

lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code §§ 17201,

17204.

189.    At all relevant times, Cynosure violated the UCL in its transactions with the

California Plaintiffs regarding SculpSure. Specifically, Cynosure deceived the California Plaintiffs

by misrepresenting certain qualities and attributes of the SculpSure procedure. Cynosure

misrepresented that:

a.    SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

b.    a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

c.    SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

190.    These misrepresentations were deceptive within the meaning of the UCL in that a reasonable person would have been deceived. And, in fact, these misrepresentations did deceive the California Plaintiffs, who would have not purchased SculpSure had they known the truth regarding the statements' falsity.

191.    Cynosure's deception has caused substantial injury to the California Plaintiffs. They cannot recommend a procedure that involves several painful treatments and still does not yield any meaningful result in the patient. And so they have spent hundreds of thousands of dollars on a machine that is ultimately inappropriate for their practice and does not work in a commercially viable way. The machine effectively goes unused, not only denying the California Plaintiffs the ability to make a profit, but also the opportunity to recoup the sizeable costs already incurred. The California Plaintiffs have lost money and had their businesses placed under considerable financial strain.

192.    Accordingly, as a direct and proximate result of Cynosure's deceptive acts and practices, the California Plaintiffs did not receive the benefit of the bargain, suffered actual

damages, and are entitled to punitive damages under Cal. Civ. Code **§** 1780, as well as attorneys' fees and costs.

## COUNT II
## COMMON LAW FRAUD (CALIFORNIA)

193.    The California Plaintiffs reallege and incorporate by reference all of the preceding allegations.

194.    The California Plaintiffs bring Count II in the alternative, if the Court were to find that Massachusetts law did not apply to their common law fraud claims.

195.    As more fully described in the allegations above, Cynosure made numerous material misrepresentations to the California Plaintiffs concerning certain attributes of SculpSure. Cynosure specifically misrepresented to the California Plaintiffs that:

    a.    SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

    b.    a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

    c.    SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

196.    In addition, Cynosure failed to disclose numerous material facts to the California Plaintiffs concerning SculpSure, and Cynosure knew that SculpSure did not possess the characteristics it represented SculpSure to have.

– 52 –

197.    The representations made by Cynosure were false. And at the time they were made, Cynosure knew those representations to be false, but made them in an effort to induce the California Plaintiffs to purchase SculpSure.

198.    The California Plaintiffs believed Cynosure's representations to be true at the time Cynosure made them. And relying on these representations, the California Plaintiffs purchased a SculpSure machine. Had the California Plaintiffs known the truth regarding these representations, they would not have purchased SculpSure.

199.    As a direct and proximate result of Cynosure's fraud, the California Plaintiffs have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT III
## FRAUD IN THE INDUCEMENT (CALIFORNIA)

200.    The California Plaintiffs reallege and incorporate by reference all of the preceding allegations.

201.    The California Plaintiffs bring Count III in the alternative, if the Court were to find that Massachusetts law did not apply to their fraud in the inducement claims.

202.    As more fully described in the allegations above, Cynosure made numerous material misrepresentations to the California Plaintiffs concerning certain attributes of SculpSure. Cynosure specifically misrepresented to the California Plaintiffs that:

    a.    SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

    b.     a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

    c.     SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

203.    In addition, Cynosure failed to disclose numerous material facts to the California Plaintiffs concerning SculpSure, and Cynosure knew that SculpSure did not possess the characteristics it represented SculpSure to have.

204.    The representations made by Cynosure were false. And at the time they were made, Cynosure knew those representations to be false, but made them in an effort to induce the California Plaintiffs to enter into a purchase agreement to buy SculpSure.

205.    The California Plaintiffs believed Cynosure's representations to be true at the time Cynosure made them. And relying on these representations, the California Plaintiffs signed the purchase agreement to buy a SculpSure machine. Had the California Plaintiffs known the truth regarding these representations, they would not have signed the agreement and purchased a SculpSure.

206.    As a direct and proximate result of Cynosure's fraud, the California Plaintiffs have been damaged in an amount to be proven at trial, and seek relief which shall include, but is not limited to, rescission of the contract, all compensatory damages, incidental and consequential damages, and other relief allowed by law.

## COUNT IV
## NEGLIGENT MISREPRESENTATION (CALIFORNIA)

207.    The California Plaintiffs reallege and incorporate by reference all of the preceding allegations.

208.    The California Plaintiffs bring Count IV in the alternative, if the Court were to find that Massachusetts law did not apply to their negligent misrepresentation claims.

209.    As alleged above, Cynosure misrepresented material facts to the California Plaintiffs in connection with its sale of SculpSure. Cynosure specifically misrepresented to the California Plaintiffs that:

     a.    SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

     b.    a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

     c.    SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

210.    Because Cynosure conveyed the misinformation in a commercial setting for a business purpose, Cynosure owed the California Plaintiffs a duty of reasonable care in obtaining and communicating information to them regarding SculpSure. Instead, Cynosure made the above-described misrepresentations without due care or competence in obtaining and communicating the information concerning SculpSure described above.

211.    Cynosure intended that the California Plaintiffs rely on these misrepresentations.

212.    The California Plaintiffs reasonably relied on these misrepresentations and purchased their SculpSure device in reliance on such misrepresentations.

213.    As a direct and proximate consequence of Cynosure's negligent misrepresentations, and the California Plaintiffs' reliance thereon, the California Plaintiffs have sustained damages, the full amount to be proven at trial.

## COUNT V
## VIOLATIONS OF THE FLORIDA DECEPTIVE & UNFAIR TRADE PRACTICES ACT
### (FLA. STAT. §§ 501.201, *et seq.*)

214.    Plaintiffs Brueck, Golosow, Kim & Associates, P.L ; Kent V. Hasen, M.D., P A ; and Infinity Spa Orlando (*Florida Plaintiffs*) reallege and incorporate by reference all of the preceding allegations.

215.    Florida's Deceptive and Unfair Trade Practices Act (*FDUTPA*) prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

216.    In the course of Cynosure's business, it committed deceptive practices within the meaning of the FDUTPA, willfully misleading the Florida Plaintiffs and intentionally misrepresenting certain qualities and attributes of the SculpSure procedure. As set forth above, Cynosure specifically misrepresented to the Florida Plaintiffs that:

       a.      SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

       b.      a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

  c.  SculpSure could be performed hands-free without a physician or trained

    staff member present during the entire procedure, when in fact one is

    required at all times to monitor energy levels and the patient's pain.

217. These misrepresentations were deceptive within the meaning of the FDUTPA because these misrepresentations were likely to mislead a consumer acting reasonably under the circumstances. And, in fact, these misrepresentations did deceive the Florida Plaintiffs because had Cynosure not misrepresented characteristics of SculpSure, as described above, the Florida Plaintiffs would not have purchased SculpSure.

218. Cynosure's conduct proximately caused injuries to the Florida Plaintiffs.

219. The Florida Plaintiffs were injured as a result of Cynosure's conduct in that they overpaid for their SculpSure and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of Cynosure's misrepresentations and omissions.

## COUNT VI
## COMMON LAW FRAUD (FLORIDA)

220. The Florida Plaintiffs reallege and incorporate by reference all of the preceding allegations.

221. The Florida Plaintiffs bring Count VI in the alternative, if the Court were to find that Massachusetts law did not apply to the Florida Plaintiffs' fraud claims.

222. As more fully described in the above allegations, Cynosure made numerous material misrepresentations to the Florida Plaintiffs concerning certain attributes of SculpSure. Cynosure specifically misrepresented to the Florida Plaintiffs that:

  a.  SculpSure requires only one 25-minute treatment to be effective, when in

    fact it requires multiple treatments and still is likely to be ineffective;

b.      a SculpSure treatment is virtually painless and easily tolerable without any

pain medication, when in fact it is very painful and patients frequently

cannot tolerate the procedure; and

c.      SculpSure could be performed hands-free without a physician or trained

staff member present during the entire procedure, when in fact one is

required at all times to monitor energy levels and the patient's pain.

223.    In addition, Cynosure failed to disclose numerous material facts to the Florida

Plaintiffs concerning SculpSure, and Cynosure knew that SculpSure did not possess the

characteristics it represented SculpSure to have.

224.    The representations made by Cynosure were false. And at the time they were made,

Cynosure knew those representations to be false, but made them in an effort to induce the Florida

Plaintiffs to purchase SculpSure.

225.    The Florida Plaintiffs believed Cynosure's representations to be true at the time

Cynosure made them. And relying on these representations, the Florida Plaintiffs purchased a

SculpSure machine. Had the Florida Plaintiffs known the truth regarding these representations,

they would not have purchased SculpSure.

226.    As a direct and proximate result of Cynosure's fraud, the Florida Plaintiffs have

been damaged in an amount to be proven at trial, which shall include, but is not limited to, all

compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT VII
## FRAUD IN THE INDUCEMENT (FLORIDA)

227.    The Florida Plaintiffs reallege and incorporate by reference all of the preceding

allegations.

228.    The Florida Plaintiffs bring Count VII in the alternative, if the Court were to find that Massachusetts law did not apply to their fraud in the inducement claims.

229.    As more fully described in the allegations above, Cynosure made numerous material misrepresentations to the Florida Plaintiffs concerning certain attributes of SculpSure. Cynosure specifically misrepresented to the Florida Plaintiffs that:

      a.    SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

      b.    a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

      c.    SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

230.    In addition, Cynosure failed to disclose numerous material facts to the Florida Plaintiffs concerning SculpSure, and Cynosure knew that SculpSure did not possess the characteristics it represented SculpSure to have.

231.    The representations made by Cynosure were false. And at the time they were made, Cynosure knew those representations to be false, but made them in an effort to induce the Florida Plaintiffs to enter into a purchase agreement to buy SculpSure.

232.    The Florida Plaintiffs believed Cynosure's representations to be true at the time Cynosure made them. And relying on these representations, the Florida Plaintiffs signed the purchase agreement to buy a SculpSure machine. Had the Florida Plaintiffs known the truth

– 59 –

regarding these representations, they would not have signed the agreement and purchased SculpSure.

233.    As a direct and proximate result of Cynosure's fraud, the Florida Plaintiffs have been damaged in an amount to be proven at trial, and seek relief which shall include, but is not limited to, rescission of the contract, all compensatory damages, incidental and consequential damages, and other relief allowed by law.

## COUNT VIII
## NEGLIGENT MISREPRESENTATION (FLORIDA)

234.    The Florida Plaintiffs reallege and incorporate by reference all of the preceding allegations.

235.    The Florida Plaintiffs bring Count VIII in the alternative, if the Court were to find that Massachusetts law did not apply to the Florida Plaintiffs' negligent misrepresentation claims.

236.    As alleged above, Cynosure misrepresented material facts to the Florida Plaintiffs in connection with its sale of SculpSure. Cynosure specifically misrepresented to the Florida Plaintiffs that:

 a. SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

 b. a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

 c. SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

237.    Cynosure owed the Florida Plaintiffs a duty of reasonable care in obtaining and communicating information to them regarding SculpSure. Instead, Cynosure made the above-described misrepresentations without due care or competence in obtaining and communicating the information concerning SculpSure described above.

238.    Cynosure intended that the Florida Plaintiffs rely on these misrepresentations.

239.    The Florida Plaintiffs reasonably relied on these misrepresentations and purchased their SculpSure device in reliance on such misrepresentations.

240.    As a direct and proximate consequence of Cynosure's negligent misrepresentations, and the Florida Plaintiff's reliance thereon, the Florida Plaintiffs have sustained damages, the full amount to be proven at trial.

## COUNT IX
## COMMON LAW FRAUD (MASSACHUSETTS)

241.    Plaintiffs reallege and incorporate by reference all of the preceding allegations.

242.    As more fully described in the above allegations, Cynosure made numerous material misrepresentations to the Plaintiffs concerning certain attributes of SculpSure. Cynosure specifically misrepresented to the Plaintiffs that:

a.    SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

b.    a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

     c.     SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

243.    In addition, Cynosure failed to disclose numerous material facts to the Plaintiffs concerning SculpSure, and Cynosure knew that SculpSure did not possess the characteristics it represented SculpSure to have.

244.    The representations made by Cynosure were false. And at the time they were made, Cynosure knew those representations to be false, but made them in an effort to induce the Plaintiffs to purchase SculpSure.

245.    Plaintiffs believed Cynosure's representations to be true at the time Cynosure made them. And relying on these representations, Plaintiffs purchased a SculpSure machine. Had Plaintiffs known the truth regarding these representations, they would not have purchased SculpSure.

246.    As a direct and proximate result of Cynosure's fraud, Plaintiffs have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT X
## FRAUD IN THE INDUCEMENT (MASSACHUSETTS)

247.    Plaintiffs reallege and incorporate by reference all of the preceding allegations.

248.    As more fully described in the allegations above, Cynosure made numerous material misrepresentations to the Plaintiffs concerning certain attributes of SculpSure. Cynosure specifically misrepresented to the Plaintiffs that:

a.    SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

b.    a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

c.    SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

249.    In addition, Cynosure failed to disclose numerous material facts to the Plaintiffs concerning SculpSure, and Cynosure knew that SculpSure did not possess the characteristics it represented SculpSure to have.

250.    The representations made by Cynosure were false. And at the time they were made, Cynosure knew those representations to be false, but made them in an effort to induce the Plaintiffs to enter into a purchase agreement to buy SculpSure.

251.    Plaintiffs believed Cynosure's representations to be true at the time Cynosure made them. And relying on these representations, the Plaintiffs signed the purchase agreement to buy a SculpSure machine. Had Plaintiffs known the truth regarding these representations, they would not have signed the agreement and purchased SculpSure.

252.    As a direct and proximate result of Cynosure's fraud, Plaintiffs have been damaged in an amount to be proven at trial, and seek relief which shall include, but is not limited to, rescission of the contract, all compensatory damages, incidental and consequential damages, and other relief allowed by law.

## COUNT XI
## NEGLIGENT MISREPRESENTATION (MASSACHUSETTS)

253.    Plaintiffs reallege and incorporate by reference all of the preceding allegations.

254.    As alleged above, Cynosure misrepresented material facts to Plaintiffs in connection with its sale of SculpSure. Cynosure specifically misrepresented to Plaintiffs that:

   a.    SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

   b.    a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

   c.    SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

255.    Cynosure owed Plaintiffs a duty of reasonable care in obtaining and communicating information to them regarding SculpSure. Instead, Cynosure made the above-described misrepresentations without due care or competence in obtaining and communicating the information concerning SculpSure described above.

256.    Cynosure intended that Plaintiffs rely on these misrepresentations.

257.    Plaintiffs reasonably relied on these misrepresentations and purchased their SculpSure device in reliance on such misrepresentations.

258.    As a direct and proximate consequence of Cynosure's negligent misrepresentations, and Plaintiffs' reliance thereon, Plaintiffs have sustained damages, the full amount to be proven at trial.

## COUNT XII
## VIOLATION OF NORTH CAROLINA UNFAIR TRADE PRACTICES ACT
### (N.C. GEN. STAT. ANN. §§ 75-1.1, *et seq.*)

259.    Plaintiff Thomas G. Liszka, M.D., PLLC realleges and incorporates by reference all paragraphs alleged herein.

260.    Thomas G. Liszka, M.D., PLLC brings Count XII under the North Carolina Unfair Trade Practices Act (*NCUTPA*), N.C. Gen. Stat. Ann. §§ 75-1, *et seq.*

261.    The NCUTPA declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. Ann. § 75-1.1.

262.    At all relevant times, Cynosure violated the NCUTPA in its transactions regarding SculpSure with Thomas G. Liszka, M.D., PLLC. Specifically, Cynosure deceived Thomas G. Liszka, M.D., PLLC by misrepresenting certain qualities and attributes of the SculpSure procedure. Cynosure misrepresented that:

      a.    SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

      b.    a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

      c.    SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

263.    Cynosure's deception has caused substantial injury to Thomas G. Liszka, M.D , PLLC. Thomas G. Liszka, M.D., PLLC cannot recommend a procedure that involves several

010674-11/1211355 V1

painful treatments and still does not yield any meaningful result in the patient. And so it has spent hundreds of thousands of dollars on a machine that is ultimately inappropriate for its practice and does not work in a commercially viable way. The machine effectively goes unused, not only denying Thomas G. Liszka, M.D , PLLC the ability to make a profit, but also the opportunity to recoup the sizeable costs already incurred. Thomas G. Liszka, M.D , PLLC has lost money and had its business placed under considerable financial strain.

264.    Accordingly, as a direct and proximate result of Cynosure's deceptive acts and practices, Thomas G. Liszka, M.D., PLLC did not receive the benefit of the bargain, suffered actual damages, and is entitled to punitive damages, plus attorneys' fees and costs.

**COUNT XIII**
**COMMON LAW FRAUD (NORTH CAROLINA)**

265.    Thomas G. Liszka, M.D., PLLC realleges and incorporates by reference all of the preceding allegations.

266.    Thomas G. Liszka, M.D., PLLC bring XIII in the alternative, if the Court were to find that Massachusetts law did not apply to Thomas G. Liszka, M.D., PLLC's fraud claims.

267.    As more fully described in the above allegations, Cynosure made numerous material misrepresentations to Thomas G. Liszka, M D., PLLC concerning certain attributes of SculpSure. Cynosure specifically misrepresented to Thomas G. Liszka, M.D., PLLC that:

  a. SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

  b. a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

– 66 –

     c.     SculpSure could be performed hands-free without a physician or trained

staff member present during the entire procedure, when in fact one is

required at all times to monitor energy levels and the patient's pain.

268.    In addition, Cynosure failed to disclose numerous material facts to Thomas G. Liszka, M.D., PLLC concerning SculpSure, and Cynosure knew that SculpSure did not possess the characteristics it represented SculpSure to have.

269.    The representations made by Cynosure were false and reasonably calculated to deceive. And at the time they were made, Cynosure knew those representations to be false, but made them in an effort to induce Thomas G. Liszka, M.D., PLLC to purchase SculpSure.

270.    Thomas G. Liszka, M.D., PLLC believed Cynosure's representations to be true at the time Cynosure made them. And relying on these representations, Thomas G. Liszka, M.D., PLLC purchased a SculpSure machine. Had Thomas G. Liszka, M.D., PLLC known the truth regarding these representations, it would not have purchased SculpSure.

271.    As a direct and proximate result of Cynosure's fraud, Thomas G. Liszka, M.D., PLLC has been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT XIV
## FRAUD IN THE INDUCEMENT (NORTH CAROLINA)

272.    Thomas G. Liszka, M.D., PLLC realleges and incorporates by reference all of the preceding allegations.

273.    Thomas G. Liszka, M.D., PLLC brings Count XIV in the alternative, if the Court were to find that Massachusetts law did not apply to its fraud in the inducement claims.

274.    As more fully described in the allegations above, Cynosure made numerous material misrepresentations to Thomas G. Liszka, M D., PLLC concerning certain attributes of SculpSure. Cynosure specifically misrepresented to Thomas G. Liszka, M.D., PLLC that:

      a.    SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

      b.    a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

      c.    SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

275.    In addition, Cynosure failed to disclose numerous material facts to Thomas G. Liszka, M.D., PLLC concerning SculpSure, and Cynosure knew that SculpSure did not possess the characteristics it represented SculpSure to have.

276.    The representations made by Cynosure were false and reasonably calculated to deceive. And at the time they were made, Cynosure knew those representations to be false, but made them in an effort to induce Thomas G. Liszka, M.D., PLLC to enter into a purchase agreement to buy SculpSure.

277.    Thomas G. Liszka, M.D., PLLC believed Cynosure's representations to be true at the time Cynosure made them. And relying on these representations, Thomas G. Liszka, M.D., PLLC signed the purchase agreement to buy a SculpSure machine. Had Thomas G. Liszka, M.D.,

– 68 –

PLLC known the truth regarding these representations, it would not have signed the agreement and purchased SculpSure.

278.     As a direct and proximate result of Cynosure's fraud, Thomas G. Liszka, M.D., PLLC has been damaged in an amount to be proven at trial, and seeks relief which shall include, but is not limited to, rescission of the contract, all compensatory damages, incidental and consequential damages, and other relief allowed by law.

## COUNT XV
## NEGLIGENT MISREPRESENTATION (NORTH CAROLINA)

279.     Thomas G. Liszka, M.D., PLLC realleges and incorporates by reference all of the preceding allegations.

280.     Thomas G. Liszka, M.D., PLLC brings Count XV in the alternative, if the Court were to find that Massachusetts law did not apply to Thomas G. Liszka, M.D., PLLC's negligent misrepresentation claims.

281.     As alleged above, Cynosure misrepresented material facts to Thomas G. Liszka, M.D., PLLC in connection with its sale of SculpSure. Cynosure specifically misrepresented to Thomas G. Liszka, M.D., PLLC that:

    a.     SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

    b.     a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

      c.     SculpSure could be performed hands-free without a physician or trained

            staff member present during the entire procedure, when in fact one is

            required at all times to monitor energy levels and the patient's pain.

282.    Cynosure owed Thomas G. Liszka, M D., PLLC a duty of reasonable care in obtaining and communicating information to it regarding SculpSure. Instead, Cynosure made the above-described misrepresentations without due care or competence in obtaining and communicating the information concerning SculpSure described above.

283.    Cynosure intended that Thomas G. Liszka, M.D., PLLC rely on these misrepresentations.

284.    Thomas G. Liszka, M.D., PLLC reasonably relied on these misrepresentations and purchased its SculpSure device in reliance on such misrepresentations.

285.    As a direct and proximate consequence of Cynosure's negligent misrepresentations, and Thomas G. Liszka, M.D., PLLC's reliance thereon, Thomas G. Liszka, M.D., PLLC has sustained damages, the full amount to be proven at trial.

## COUNT XVI
## COMMON LAW FRAUD (PENNSYLVANIA)

286.    Plaintiff Susquehanna Valley Vein Center, LLC realleges and incorporates by reference all paragraphs alleged herein.

287.    Susquehanna Valley Vein Center, LLC brings Count XVI in the alternative, if the Court were to find that Massachusetts law did not apply to Susquehanna Valley Vein Center, LLC's fraud claims.

288.    As more fully described in the above allegations, Cynosure made numerous material misrepresentations to Susquehanna Valley Vein Center, LLC concerning certain

attributes of SculpSure. Cynosure specifically misrepresented to Susquehanna Valley Vein Center, LLC that:

      a.    SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

      b.    a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

      c.    SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

289.    In addition, Cynosure failed to disclose numerous material facts to Susquehanna Valley Vein Center, LLC concerning SculpSure, and Cynosure knew that SculpSure did not possess the characteristics it represented SculpSure to have.

290.    The representations made by Cynosure were false. And at the time they were made, Cynosure knew those representations to be false, but made them in an effort to induce Susquehanna Valley Vein Center, LLC to purchase SculpSure.

291.    Susquehanna Valley Vein Center, LLC believed Cynosure's representations to be true at the time Cynosure made them. And relying on these representations, Susquehanna Valley Vein Center, LLC purchased a SculpSure machine. Had Susquehanna Valley Vein Center, LLC known the truth regarding these representations, it would not have purchased SculpSure.

292.    As a direct and proximate result of Cynosure's fraud, Susquehanna Valley Vein Center, LLC has been damaged in an amount to be proven at trial, which shall include, but is not

limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT XVII
## FRAUD IN THE INDUCEMENT (PENNSYLVANIA)

293.   Susquehanna Valley Vein Center, LLC realleges and incorporates by reference all of the preceding allegations.

294.   Susquehanna Valley Vein Center, LLC brings Count XVII in the alternative, if the Court were to find that Massachusetts law did not apply to its fraud in the inducement claims.

295.   As more fully described in the allegations above, Cynosure made numerous material misrepresentations to Susquehanna Valley Vein Center, LLC concerning certain attributes of SculpSure. Cynosure specifically misrepresented to Susquehanna Valley Vein Center, LLC that:

  a.   SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

  b.   a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

  c.   SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

296.   In addition, Cynosure failed to disclose numerous material facts to Susquehanna Valley Vein Center, LLC concerning SculpSure, and Cynosure knew that SculpSure did not possess the characteristics it represented SculpSure to have.

– 72 –

297.    The representations made by Cynosure were false. And at the time they were made, Cynosure knew those representations to be false, but made them in an effort to induce Susquehanna Valley Vein Center, LLC to enter into a purchase agreement to buy SculpSure.

298.    Susquehanna Valley Vein Center, LLC believed Cynosure's representations to be true at the time Cynosure made them. And relying on these representations, Susquehanna Valley Vein Center, LLC signed the purchase agreement to buy a SculpSure machine. Had Susquehanna Valley Vein Center, LLC known the truth regarding these representations, it would not have signed the agreement and purchased SculpSure.

299.    As a direct and proximate result of Cynosure's fraud, Susquehanna Valley Vein Center, LLC has been damaged in an amount to be proven at trial, and seeks relief which shall include, but is not limited to, rescission of the contract, all compensatory damages, incidental and consequential damages, and other relief allowed by law.

## COUNT XVIII
## NEGLIGENT MISREPRESENTATION (PENNSYLVANIA)

300.    Susquehanna Valley Vein Center, LLC realleges and incorporates by reference all of the preceding allegations.

301.    Susquehanna Valley Vein Center, LLC brings Count XVIII in the alternative, if the Court were to find that Massachusetts law did not apply to Susquehanna Valley Vein Center, LLC's negligent misrepresentation claims.

302.    As alleged above, Cynosure misrepresented material facts to Susquehanna Valley Vein Center, LLC in connection with its sale of SculpSure. Cynosure specifically misrepresented to Susquehanna Valley Vein Center, LLC that:

a.   SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

b.   a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

c.   SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

303.   Cynosure owed Susquehanna Valley Vein Center, LLC a duty of reasonable care in obtaining and communicating information to it regarding SculpSure. Instead, Cynosure made the above-described misrepresentations without due care or competence in obtaining and communicating the information concerning SculpSure described above.

304.   Cynosure intended that Susquehanna Valley Vein Center, LLC rely on these misrepresentations.

305.   Susquehanna Valley Vein Center, LLC reasonably relied on these misrepresentations and purchased its SculpSure device in reliance on such misrepresentations.

306.   As a direct and proximate consequence of Cynosure's negligent misrepresentations, and Susquehanna Valley Vein Center, LLC's reliance thereon, Susquehanna Valley Vein Center, LLC has sustained damages, the full amount to be proven at trial.

## COUNT XIX
### VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT
### (WASH. REV. CODE ANN. §§ 19.86.010, *et seq.*)

307.   Plaintiff Nicholas A. Flugstad, M.D., P.S. realleges and incorporates by reference all paragraphs alleged herein.

– 74 –

308.    Nicholas A. Flugstad, M.D., P.S. brings Count XIX under the Washington Consumer Protection Act (WCPA), Wash. Rev. Code Ann. §§ 19.86.010, *et seq.*

309.    The WCPA declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code Ann. § 19.86.020.

310.    Nicholas A. Flugstad, M.D., P.S. and Cynosure are both persons under the WCPA. *Id.* § 19.86.010(1).

311.    Cynosure engaged in "trade" and "commerce" when it sold SculpSure to Nicholas A. Flugstad, M.D., P.S. *Id.* § 19.86.010(2).

312.    At all relevant times, Cynosure violated the WCPA in its transactions regarding SculpSure with Nicholas A. Flugstad, M.D., P.S. Specifically, Cynosure deceived Nicholas A. Flugstad, M.D., P.S. by misrepresenting certain qualities and attributes of the SculpSure procedure. Cynosure misrepresented that:

    a.    SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

    b.    a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

    c.    SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

313.    Cynosure's deception has caused substantial injury to Nicholas A. Flugstad, M.D., P.S. Nicholas A. Flugstad, M D., P.S. cannot recommend a procedure that involves several painful treatments and still does not yield any meaningful result in the patient. And so it has spent hundreds of thousands of dollars on a machine that is ultimately inappropriate for its practice and does not work in a commercially viable way. The machine effectively goes unused, not only denying Nicholas A. Flugstad, M.D , P.S. the ability to make a profit, but also the opportunity to recoup the sizeable costs already incurred. Nicholas A. Flugstad, M.D., P.S. has lost money and had its business placed under considerable financial strain.

314.    Cynosure's deception also affects the public interest, in that it was a part of a pattern of conduct and additional plaintiffs have been injured in exactly the same fashion as Nicholas A. Flugstad, M.D., P.S.

315.    Accordingly, as a direct and proximate result of Cynosure's deceptive acts and practices, Nicholas A. Flugstad, M.D., P.S. did not receive the benefit of the bargain, suffered actual damages, and is entitled to punitive damages, plus attorneys' fees and costs.

**COUNT XX**
**COMMON LAW FRAUD (WASHINGTON)**

316.    Nicholas A. Flugstad, M.D., P.S. realleges and incorporates by reference all of the preceding allegations.

317.    Nicholas A. Flugstad, M.D., P.S. brings Count XX in the alternative, if the Court were to find that Massachusetts law did not apply to Nicholas A. Flugstad, M.D., P.S.'s fraud claims.

318.    As more fully described in the above allegations, Cynosure made numerous material misrepresentations to Nicholas A. Flugstad, M.D., P.S. concerning certain attributes of SculpSure. Cynosure specifically misrepresented to Nicholas A. Flugstad, M.D., P.S. that:

a.      SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

b.      a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

c.      SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

319.    In addition, Cynosure failed to disclose numerous material facts to Nicholas A. Flugstad, M.D., P.S. concerning SculpSure, and Cynosure knew that SculpSure did not possess the characteristics it represented SculpSure to have.

320.    The representations made by Cynosure were false and reasonably calculated to deceive. And at the time they were made, Cynosure knew those representations to be false, but made them in an effort to induce Nicholas A. Flugstad, M.D., P.S. to purchase SculpSure.

321.    Nicholas A. Flugstad, M.D., P.S. believed Cynosure's representations to be true at the time Cynosure made them. And relying on these representations, Nicholas A. Flugstad, M.D., P.S. purchased a SculpSure machine. Had Nicholas A. Flugstad, M.D , P.S. known the truth regarding these representations, it would not have purchased SculpSure.

322.     As a direct and proximate result of Cynosure's fraud, Nicholas A. Flugstad, M.D., P.S. has been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT XXI
## FRAUD IN THE INDUCEMENT (WASHINGTON)

323.     Nicholas A. Flugstad, M.D., P.S. realleges and incorporates by reference all of the preceding allegations.

324.     Nicholas A. Flugstad, M.D., P.S. brings Count XXI in the alternative, if the Court were to find that Massachusetts law did not apply to its fraud in the inducement claims.

325.     As more fully described in the allegations above, Cynosure made numerous material misrepresentations to Nicholas A. Flugstad, M.D., P.S. concerning certain attributes of SculpSure. Cynosure specifically misrepresented to Nicholas A. Flugstad, M.D., P.S. that:

a.       SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

b.       a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

c.       SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

326.     In addition, Cynosure failed to disclose numerous material facts to Nicholas A. Flugstad, M.D., P.S. concerning SculpSure, and Cynosure knew that SculpSure did not possess the characteristics it represented SculpSure to have.

327.     The representations made by Cynosure were false and reasonably calculated to deceive. And at the time they were made, Cynosure knew those representations to be false, but made them in an effort to induce Nicholas A. Flugstad, M.D., P.S. to enter into a purchase agreement to buy SculpSure.

328.     Nicholas A. Flugstad, M.D., P.S. believed Cynosure's representations to be true at the time Cynosure made them. And relying on these representations, Nicholas A. Flugstad, M.D., P.S. signed the purchase agreement to buy a SculpSure machine. Had Nicholas A. Flugstad, M.D., P.S. known the truth regarding these representations, it would not have signed the agreement and purchased SculpSure.

329.     As a direct and proximate result of Cynosure's fraud, Nicholas A. Flugstad, M.D., P.S. has been damaged in an amount to be proven at trial, and seeks relief which shall include, but is not limited to, rescission of the contract, all compensatory damages, incidental and consequential damages, and other relief allowed by law.

## COUNT XXII
## NEGLIGENT MISREPRESENTATION (WASHINGTON)

330.     Nicholas A. Flugstad, M.D., P.S. realleges and incorporates by reference all of the preceding allegations.

331.     Nicholas A. Flugstad, M.D., P.S. brings Count XXII in the alternative, if the Court were to find that Massachusetts law did not apply to Nicholas A. Flugstad, M.D., P.S.'s negligent misrepresentation claims.

010674-11/1211355 V1

332.    As alleged above, Cynosure misrepresented material facts to Nicholas A. Flugstad, M.D., P.S. in connection with its sale of SculpSure. Cynosure specifically misrepresented to Nicholas A. Flugstad, M.D., P.S. that:

a.    SculpSure requires only one 25-minute treatment to be effective, when in fact it requires multiple treatments and still is likely to be ineffective;

b.    a SculpSure treatment is virtually painless and easily tolerable without any pain medication, when in fact it is very painful and patients frequently cannot tolerate the procedure; and

c.    SculpSure could be performed hands-free without a physician or trained staff member present during the entire procedure, when in fact one is required at all times to monitor energy levels and the patient's pain.

333.    Cynosure owed Nicholas A. Flugstad, M.D., P.S. a duty of reasonable care in obtaining and communicating information to it regarding SculpSure. Instead, Cynosure made the above-described misrepresentations without due care or competence in obtaining and communicating the information concerning SculpSure described above.

334.    Cynosure intended that Nicholas A. Flugstad, M.D., P.S. rely on these misrepresentations.

335.    Nicholas A. Flugstad, M.D., P.S. reasonably relied on these misrepresentations and purchased its SculpSure device in reliance on such misrepresentations.

336.    As a direct and proximate consequence of Cynosure's negligent misrepresentations, and Nicholas A. Flugstad, M.D., P.S.'s reliance thereon, Nicholas A. Flugstad, M.D., P.S. has sustained damages, the full amount to be proven at trial.

## VII.    PRAYERS FOR RELIEF

337.    WHEREFORE, all Plaintiffs request that the Court enter an order or judgment

against Cynosure including the following:

       a.    Finding that Cynosure committed fraud in selling the SculpSure device to

           Plaintiffs and awarding compensatory damages, incidental and

           consequential damages, and other damages allowed by law;

       b.    Finding that Cynosure fraudulently induced the Plaintiffs into entering into

           a purchase agreement with Cynosure and awarding the Plaintiffs rescission

           of such contract;

       c.    Whether Cynosure's conduct warrants punitive damages; and

       d.    Awarding such other and further relief the Court deems just and equitable.

338.    WHEREFORE, the California Plaintiffs request that the Court enter an order or

judgment against Cynosure including the following:

       a.    Finding that Cynosure has violated the UCL, and awarding the California

           Plaintiffs restitution, and any other damages or relief allowed by law;

       b.    Finding that Cynosure committed fraud in selling the SculpSure device to

           the California Plaintiffs and awarding compensatory damages, incidental

           and consequential damages, and other damages allowed by law;

       c.    Finding that Cynosure fraudulently induced the California Plaintiffs into

           entering into a purchase agreement with Cynosure and awarding the

           California Plaintiffs rescission of such contract;

       d.    Whether Cynosure's conduct warrants punitive damages; and

       e.    Awarding such other and further relief the Court deems just and equitable.

010674-11/1211355 V1

339.    WHEREFORE, the Florida Plaintiffs request that the Court enter an order or judgment against Cynosure including the following:

   a.    Finding that Cynosure has violated the FDUTPA, and awarding the Florida Plaintiffs actual damages, punitive and/or treble damages, attorneys' fees, and costs under FDUTPA;

   b.    Finding that Cynosure committed fraud in selling the SculpSure device to the Florida Plaintiffs and awarding compensatory damages, incidental and consequential damages, and other damages allowed by law;

   c.    Finding that Cynosure fraudulently induced the Florida Plaintiffs into entering into a purchase agreement with Cynosure and awarding the Florida Plaintiffs rescission of such contract;

   d.    Whether Cynosure's conduct warrants punitive damages; and

   e.    Awarding such other and further relief the Court deems just and equitable.

340.    WHEREFORE, North Carolina Plaintiff Thomas G. Liszka, M.D., PLLC requests that the Court enter an order or judgment against Cynosure including the following:

   a.    Finding that Cynosure has violated the NCUTPA, and awarding Thomas G. Liszka, M.D., PLLC actual damages, punitive and/or treble damages, attorneys' fees, and costs under the NCUTPA;

   b.    Finding that Cynosure committed fraud in selling the SculpSure device to Thomas G. Liszka, M.D., PLLC and awarding compensatory damages, incidental and consequential damages, and other damages allowed by law;

c.    Finding that Cynosure fraudulently induced Thomas G. Liszka, M.D., PLLC into entering into a purchase agreement with Cynosure and awarding Thomas G. Liszka, M.D., PLLC rescission of such contract;

d.    Whether Cynosure's conduct warrants punitive damages; and

e.    Awarding such other and further relief the Court deems just and equitable.

341.    WHEREFORE, Pennsylvania Plaintiff Susquehanna Valley Vein Center, LLC requests that the Court enter an order or judgment against Cynosure including the following:

a.    Finding that Cynosure committed fraud in selling the SculpSure device to Susquehanna Valley Vein Center, LLC and awarding compensatory damages, incidental and consequential damages, and other damages allowed by law;

b.    Finding that Cynosure fraudulently induced Susquehanna Valley Vein Center, LLC into entering into a purchase agreement with Cynosure and awarding Susquehanna Valley Vein Center, LLC rescission of such contract;

c.    Whether Cynosure's conduct warrants punitive damages; and

d.    Awarding such other and further relief the Court deems just and equitable.

342.    WHEREFORE, Washington Plaintiff Nicholas A. Flugstad, M.D., P.S. requests that the Court enter an order or judgment against Cynosure including the following:

a.    Finding that Cynosure has violated the WCPA, and awarding Nicholas A. Flugstad, M.D., P.S. actual damages, punitive and/or treble damages, attorneys' fees, and costs under the WCPA;

b.     Finding that Cynosure committed fraud in selling the SculpSure device to

Nicholas A. Flugstad, M.D., P.S. and awarding compensatory damages,

incidental and consequential damages, and other damages allowed by law;

c.     Finding that Cynosure fraudulently induced Nicholas A. Flugstad, M.D ,

P.S. into entering into a purchase agreement with Cynosure and awarding

Nicholas A. Flugstad, M.D., P.S. rescission of such contract;

d.     Whether Cynosure's conduct warrants punitive damages; and

e.     Awarding such other and further relief the Court deems just and equitable.

## VIII.   JURY DEMAND

Plaintiffs demand a trial by jury for all issues so triable.

Dated: November 20, 2019                    Respectfully Submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By:   */s/ Lauren Guth Barnes*

Lauren Guth Barnes (BBO# 663819)
55 Cambridge Parkway, Suite 301
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
Email: lauren@hbsslaw.com

Jason A. Zweig (*pro hac vice* to be filed)
Mark T. Vazquez (*pro hac vice* to be filed)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
Email: jasonz@hbsslaw.com
Email: markv@hbsslaw.com

Steve W. Berman (*pro hac vice* to be filed)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com

*Attorneys for Plaintiffs*

010674-11/1211355 V1